**THE STATE OF FLORIDA, ex rel. VINCENT C. GIBLIN v. JIMMY SULLIVAN, as Sheriff of Dade County, Florida.**

26 So. (2nd) 509    January Term, 1946
May 28, 1946    En Banc

James M. Carson, G. A. Worley and Jack Kehoe, Bart A. Riley and W. G. Starry, for petitioner.

J. Tom Watson, Attorney General, and Reeves Bowen, Assistant Attorney General, for respondent.

Thomas H. Anderson and E. F. P. Brigham, amici curiae.

CHAPMAN, C. J.:

On February 21, 1946, the State of Florida, on the relation of Vincent C. Giblin, as an attorney in his own behalf, under the provisions of Section 64.11, Fla. Stats. 1941 (FSA), filed in the Circuit Court of Dade County, Florida, a bill of complaint praying for a temporary and permanent injunction against named defendants from conducting, maintaining and operating games of chance or gambling at a designated place in Miami, Florida, as defined by the laws of Florida under the terms and provisions of Section 823.05, Fla. Stats. 1941 (FSA), and made a nuisance and subject to abatement by an appropriate order by a court of chancery. An afidavit attached to the bill of complaint, in part, recited that the rela-

tor, Vincent C. Giblin, having been first duly sworn, on his oath deposed and said that he has "read and knows the contents of such bill of complaint and that the matters and things therein alleged and set forth are true in substance and in fact."

On February 22, 1946, the relator gave notice to the defendants that he would apply for a temporary injunction before the Honorable Stanley Milledge, one of the Circuit Judges of Dade County, Florida, restraining the named defendants from their continued violation of the gambling laws of Florida, and would be heard on Wednesday, February 27, 1946, at 4:30 P. M. The date of hearing was changed by the Court from the aforesaid date and hour to 10:00 A. M. March 2, 1946. On March 1, 1946, counsel for the defendants presented to Judge Milledge a petition of disqualification and upon denial thereof counsel for the defendants applied here for a writ of prohibition against Judge Milledge and the rule nisi issued and the parties were heard here on the issues made, when this Court on the 8th day of March, 1946, held that Judge Milledge was qualified to hear and determine the controversy.

The relator, on March 2, 1946, under the provisions of Section 64.13, Fla. Stats. 1941 (FSA) filed a motion to dismiss the bill of complaint brought in the name of the State of Florida on the relation of Vincent C. Giblin. Attached to the motion to dismiss and made a part thereof was an affidavit setting forth the grounds and reasons for the order of dismissal. On March 8, 1946, an order was entered denying the motion to dismiss the bill of complaint, but in the same order did discharge and dismiss the relator Vincent C. Giblin and substituted therefor as relators P. M. Williams, Glenn C. Mincer, State Attorney, and Robert R. Taylor, County Solicitor of Dade County. In the order dated March 8, 1946, the court, in part, said:

" . . . the Court finds it abundantly clear that the said relator has come into a court of equity with unclean hands, and his bill of complaint, and his attempt to dismiss the same, constitutes a base and utterly reprehensible attempt to use this Court for a most unconscionable purpose. To permit the

Courts of this State to be so used would constitute an infinitely greater danger to the public welfare than the existence of a public nuisance."

Counsel for defendants filed a motion to dismiss the bill of complaint on some eighteen grounds, one of which is viz:

"The attempt by the Judge of this court in the entry of said sua sponte order in this cause on the 8th day of March, 1946, to substitute other relators, coult not purge this suit and cause of action of the taint which the court held and determined existed, and was the cause of its institution.

"The court has definitely held that the bill of complaint was filed under such conditions as to not only render it inequitable and relator, Giblin, without any standing, has ordered the said Giblin ejected from said cause as relator, on account of the unclean hands and base purposes of the relator in filing the same; therefore, the said Giblin being the movant in the institution of said suit, and the State of Florida being in privity with said Giblin in the bringing of same, said suit and cause of action is itself so permeated with corruption and fraud that a court of equity will not permit the further maintenance thereof."

The lower court on March 12, 1946, entered an order denying the motion to dismiss and after hearing testimony on the merits entered a permanent injunction restraining, prohibiting and enjoining the several named defendants and their servants and employees from conducting and operating games of chance contrary to law at places designated in the order dated March 13, 1946.

On April 4, 1946, Judge Milledge entered a judgment finding Vincent C. Giblin guilty of direct contempt and committed him to the Dade County, Florida jail for a period of six months. The judgment and sentence was delivered to the Sheriff of Dade County, Florida, on April 4, 1946, and Vincent C. Giblin was taken into custody on the following day, April 5, 1946. The judgment and sentence were filed and recorded in the office of the Clerk of the Circuit Court on April 8, 1946. Vincent C. Giblin by petition filed in this Court alleged that he was being unlawfully restrained and denied his liberties by the Sheriff of Dade County, Florida. Writ of habeas corpus

issued as prayed for and a return thereto as made by the Sheriff of Dade County disclosed that Giblin was held by him under the judgment and sentence for direct contempt entered by Judge Milledge on April 4, 1946.

The basis for the contempt judgment and sentence as disclosed by the record is an affidavit dated March 2, 1946, made by Vincent C. Giblin and appended to and offered in support of his motion to dismiss the case of State of Florida on the relation of Vincent C. Giblin v. Howard Losey, et al., then pending before Judge Milledge. Section 64.13, Fla. Stats. 1946, in part, provided, "No bill of complaint when filed by any citizen shall be dismissed except upon a sworn statement made by said citizen and submitted to the Court and unless the Court shall be satisfied that said cause shall be dismissed, the said bill shall not be dismissed but continue and the State Attorney or County Solicitor notified to proceed with said cause."

Pertinent portions of the affidavit are viz:

"On February 22, 1946 Judge Milledge, through his secretary, gave me an appointment for the hearing of my application for a temporary injunction. The matter was set for hearing on February 27, 1946, at 4:30 o'clock in the afternoon. I immediately gave the required three days' notice in writing to all of the defendants.

"On the morning of February 27, 1946 I was advised by Judge Milledge's secretary that the Judge had postponed the scheduled hearing at the telegraphic request of a Tampa attorney, who said that he had just been employed to represent the defendants, or some of them, and had not had sufficient time to familiarize himself with the case and to prepare for the hearing. The postponement was to March 2, 1946, at ten o'clock in the forenoon.

"Judge Milledge granted the postponment without consulting me and without according me the privilege of being heard in opposition to the request for a deferment. The defendants had had from February 21, 1946, the day on which the suit was filed and on which the defendants learned of its filing, to employ an attorney. They waited until the day scheduled for the hearing to employ a Tampa attorney. The

reason for the employment of the Tampa attorney, rather than one or more of the several hundred attorneys in the Miami area, will be made apparent at a later point in this statement.

"On March 1, 1946, the eve of the day to which Judge Milledge postponed the hearing of my application for a temporary injunction, the Tampa attorney met Judge Milledge, pursuant to prearrangement between them, in the latter's office in the court house, at or before nine o'clock in the forenoon (an unusual time for Judge Milledge to be in his office). The Tampa attorney presented to the judge (without having previously filed it in the clerk's office) a motion or petition for the disqualification of the judge.

"If the motion or petition had been granted, my application for a temporary injunction could and would have been heard by another of the six local circuit judges without undue delay. The Tampa attorney and the judge knew, of course, that the disqualification of the latter would not accord the defendant gamblers the prolonged delay they are so desperately seeking. When the matter is heard, the gambling casino will be closed by injunction and gambling profits will cease to flow in enormous amounts into the pockets of the powerful local gambling syndicate composed of five of the defendants. Not even Judge Milledge could justifiably deny the application.

"The motion or petition for the judge's disqualification was denied by him. The order of denial was precisely what the Tampa attorney and his clientele of gamblers wanted. The judge had provided them with a plausible reason for appealing to the Supreme Court of Florida for a writ of prohibition to restrain the judge (who, they say, is prejudiced against *them!*) from hearing the case. They hope and expect that the proceedings in the Supreme Court, which were initiated on March 1, 1946, will consume enough time to enable the syndicate to reap profits from their gambling activities throughout the present profitable winter tourist season and into the summer months.

"The Supreme Court on March 1, 1946, issued a rule nisi, directed to Judge Milledge, by which he is required to show cause on March 5, 1946, why he should not be prohibited, be-

cause of his alleged disqualification, from acting in or hearing the case. By the time the learned judge's return to the rule is filed, briefs are filed, oral arguments are heard by the Supreme Court and its opinion is handed down, our tourists will have departed, the summer lull will have set in and the community will have again donned the veil of civic morality.

. "The meeting of the Tampa attorney and Judge Milledge in the latter's office on March 1, 1946, and the accommodating action which the judge took, to the delight of the attorney and his new clients, were without any notice whatever to me and without my knowledge. Of course, my presence was not desired, because I would not have opposed the effort to disqualify the judge, but would have immediately sought an early hearing of my application by another of the six judges. I am firmly convinced and firmly believe (and who wouldn't) that Judge Milledge has knowingly and purposefully cooperated with the Tampa attorney and his clientele in a common design to extend the gambling activities of the syndicate for a prolonged period. And I have ample reason for my belief. Associated with the defendant gamblers, and financially interested in their 86 Club operations, is one Charlie Wall of Tampa, a man of parts in gambling circles. His association and interest are not of recent origin. He and some of the present syndicate—William Bartlett, Charlie Thomas and Uke Byer—were associated in the gambling enterprise at the Royal Palm Club in Miami during the lucrative winter season of 1940-41.

"Mr. Milledge was elected state attorney in 1942. He campaigned for the office on a platform of civic decency and morality and as an advocate of strict law enforcement.

"After the election Charlie Wall visited my office for an informal chat. I said to him, "Charlie, it looks as if you fellows are in a bad way. I don't think Stanley Milledge is going to permit any gambling to go in Dade County." Charlie replied, "Well, I don't know about that. I think Mr. Milledge is our friend. We had something to do with his appointment as circuit judge."

"I asked him to tell me the story, which was this: In the latter part of 1940, when Mr. Milledge was an aspirant for one

of two vacant circuit judgeships, he and Mr. Perry Nichols went to Tampa for a conference with Charlie and to enlist his support in Mr. Milledge's behalf. They found Charlie sympathetic. He sent for a Miami man (whose name Charlie refused to divulge) who knew Governor Cone's daughter. The Miamian joined in the conference. He agreed to talk to the Governor's daughter. The Governor and his daughter were in New York at the New Yorker Hotel, talked to the Governor's daughter, the daughter talked to the Governor and the Governor appointed Mr. Milledge as one of our circuit judges. Mr. Milledge expressed his appreciation of the assistance which Charlie's friend, the unnamed Miamian, had rendered.

"Governor Cone did not know Mr. Milledge, but his successor, Governor Holland, did. When the Legislature convened in 1941, after Governor Holland had assumed office, he declined to send Judge Milledge's name to the Senate for confirmation. He appointed Judge George E. Holt to succeed Judge Milledge.

"In 1942, Mr. Milledge, whose candidacy was fostered and promoted by our local newspapers, was elected state attorney. During the winter season of 1943-44 Charlie Wall's syndicate (some of the members of which are presently operating the elaborate and magnificent gambling place on Biscayne Boulevard) opened and operated a notorious gambling establishment, called "The Farm," south of Miami. It was operated during the major part of the tourist season. The gambling operations at the syndicate's rural establishment were immensely profitable until the Brook Club (in Surfside) and the Sunny Isles Casino (on the ocean north of Miami Beach) opened their doors and provided acute and destructive competition. The competing places were opened in March, 1944. The erstwhile reform state attorney had not molested "The Farm," but when its competitors weaned away the syndicate's customers and patrons, Charlie's friend, the state attorney, instituted injunction suits against the operators of the Brook Club and the Sunny Isles Casino. No injunction suit was brought against the operators of "The Farm."

"There is, therefore, belief for the suspicion that the state attorney was paying his debt to Charlie and his syndicate.

And there is belief for the suspicion that Judge Milledge feels that the debt has not yet been fully paid, because his accommodating and clandestine refusal to disqualify himself was an extension by him of a helping hand to Charlie and his associates in their hour of need.

"For the stated reasons, I ask (by the motion to which this sworn statement is appended) that the bill of complaint in the present suit be dismissed, not because I am abandoning the action therein alleged, but because I wish to file another and similar bill and to have the new suit heard and tried by a judge in whose honesty and integrity I have confidence."

One of the first questions for adjudication here is whether or not the motion to dismiss and the content of the appended affidavit filed in the lower court under the provisions of Section 64.13, Fla. Stats. 1941 (FSA), seeking an order of dismissal of the bill of complaint is such a pleading in a judicial proceeding as will protect the pleader under the rule of privileged publication. The applicable rule was enunciated by this Court in the case of Myers v. Hodges, 53 Fla. 197, 44 So. 357, when we, in part, said:

"In the United States, according to the overwhelming weight of authority, in order that defamatory words, published by parties, counsel or witnesses in the due course of a judicial procedure may be absolutely privileged they must be connected with, or relevant or material to the cause in hand or subject of injury. If they be so published and are so relevant or pertinent to the subject of inquiry, no action will lie therefor, however false or malicious they may in fact be."

See Fisher v. Payne, 93 Fla. 1085, 113 So. 378; Ange v. State, 98 Fla. 538, 123 So. 916; Shiell v. Metropolis Co., 102 Fla. 794, 136 So. 537; Taylor v. Alropa Corp., 138 Fla. 140, 189 So. 230; Merriman v. Lewis, 141 Fla. 836, 194 So. 349.

In light of the rule as expressed in Myers v. Hodges, *supra,* and reaffirmed in many subsequent holdings, it is difficult for us to appreciate the relevancy or the materiality of certain excerpts in the appended affidavit viz.

"If the motion or petition had been granted, my application for a temporary injunction could and would have been

heard by another of the six local circuit judges without undue delay. The Tampa attorney and the judge knew, of course, that the disqualification of the latter would not accord the defendant gamblers the prolonged delay they are so desperately seeking. When the matter is heard, the gambling casino will be closed by injunction and gambling profits will cease to flow in enormous amounts into the pockets of the powerful local gambling syndicate composed of five of the defendants. Not even Judge Milledge could justifiably deny the application."

"The motion or petition for the judge's disqualification was denied by him. The order of denial was precisely what the Tampa attorney and his clientele of gamblers wanted. The judge had provided them with a plausible reason for appealing to the Supreme Court of Florida for a writ of prohibition to restrain the judge (who, they say, is prejudiced against *them!*) from hearing the case. They hope and expect that the proceedings in the Supreme Court, which were initiated on March 1, 1946, will consume enough time to enable the syndicate to reap profits from their gambling activities throughout the present profitable winter tourist season and into the summer months."

"The meeting of the Tampa attorney and Judge Milledge in the latter's office on March 1, 1946 and the accommodating action which the judge took, to the delight of the attorney and his new clients, were without any notice whatever to me and without my knowledge. Of course, my presence was not desired, because I would not have opposed the effort to disqualify the judge, but would have immediately sought an early hearing of my application by another of the six judges."

"I am firmly convinced and firmly believe (and who wouldn't) that Judge Milledge had knowingly and purposefully cooperated with the Tampa attorney and his clientele in a common design to extend the gambling activities of the syndicate for a prolonged period. And I have ample reasons for my belief.

"There is therefore, belief for the suspicion that the state attorney was paying his debt to Charlie and his syndicate.

"And there is belief for the suspicion that Judge Milledge feels that the debt has not yet been fully paid, because his accommodating and clandestine refusal to disqualify himself was an extension by him of a helping hand to Charlie and his associates in their hour of need.

"For the stated reasons, I ask (by the motion to which this sworn statement is appended) that the bill of complaint in the present suit be dismissed, not because I am abandoning the cause of action therein alleged, but because I wish to file another and similar bill and to have the new suit heard and tried by a judge in whose honesty and integrity I have confidence."

Courts do not only have or possess the inherent power to punish for contempt but such power has been conferred by the Legislature by an appropriate statute. See Chapter 23.004, Acts of 1945, Laws of Florida. Judicial wisdom and the experiences of the past would seem to demand that the extraordinary powers given to courts to publish for contempt be not used except to prevent actual and direct obstruction or interference with the administration of justice. State ex rel. McGregor v. Peacock, 113 Fla. 816, 152 So. 616.

Determination of the facts, and inferences to be drawn therefrom, is necessarily left to the decision of the trial judge, and his conclusions as to the acts done, and as to their contemptuous character or effect, will not be lightly disturbed by this court on habeas corpus. Nor will the findings of the judge ordinarily be set aside when reasonably supported by the facts appearing of record. Zarate v. Culbreath, 150 Fla. 543, 8 So. (2nd) 1; State ex rel Grebstein v. Lehman, 100 Fla. 473, 129 So. 818; Baumgartner v. Joughin, 105 Fla. 335, 141 So. 785.

As a general rule, any publication tending to intimidate, influence, impede, embarrass or obstruct courts in the due administration of justice in matters pending before them constitutes contempt. The rule applies to any publication which has a tendency to prejudice or prevent fair and impartial action in a case under judicial investigation or by reflecting on the court, counsel, parties or witnesses respecting the cause. It is not necessary to show that they actually

obstructed, impeded or embarrassed the administration of justice, although it must appear that their tendency was of that character. Ex parte Biggers, 85 Fla. 322, 95 So. 763; 17 C.J.S. 42-43, par. 30. The filing of papers, however, which are gross and indelicate in language, the use of scandalous language in a brief, or the making of statements therein charging the court with improper motives in rendering a certain line of decisions, may constitute contempt. 12 Am. Jur. 395-398, pars. 9-14.

Arising from a consideration of the record is the second question viz: Was it a direct contempt of the lower court for the petitioner here, when acting in the dual capacity of litigant and attorney in chancery suit, to file with the Clerk of the Circuit Court of Dade County, Florida, under date of March 2, 1946, the affidavit, *supra*, appended to the motion to dismiss?

The case of Fleming v. United States, 279 Fed. 613, involved a judgment of contempt and certiorari was denied by the United States Supreme Court. See 260 U.S. 752. Fleming filed a motion in court for a change of venue and an affidavit in support thereof. The affidavit charged the trial Judge viz: (1) that the Judge was prejudiced against him; (2) the Judge was a party to his prosecution; (3) the Judge was a party to a crime of embezzlement; (4) the Judge conspired with others to slander and defame the affiant; (5) the acts of conspiracy by the Judge were to conceal his crime of embezzlement; (6) the Judge made false and malicious charges against the affiant. The motion and supporting affidavit were filed in court and later read to the trial Judge. The court found that the attorney's conduct was a direct contempt committed in the presence of the court and it was necessary to take testimony to show that the charges made by the defendant were untrue.

In State ex rel. Short v. Owens, 125 Okla. 66, 256 Pac. 704, 52 A.L.R. 1270, the litigant Owens, in a verified motion for leave to file a petition for rehearing filed in court, charged that an opinion was not written by a member of the Court, but by an attorney in the suit; that the judgment was rendered without evidence to support it, and without proper

consideration of briefs or records, and that a conspiracy existed between the members of the Court and outsiders to render a corrupt judgment, and that an opinion and judgment was promulgated by a number less than a majority. The Court held that the filing of such a verified motion constituted direct contempt.

In McCormick v. Sheridan, 3 Cal. Unrep. 35, 20 Pac. 24, the Supreme Court of California held the filing of a petition for rehearing containing insinuations and charges against the court, was a direct contempt committed in the face of the court.

In the Owens case, supra, the respondent signed and verified the instrument filed in the court out of which the contempt action grew.

In Ex parte Sullivan, 10 Okla. Cr. Rep. 465, 138 Pac. 815, Ann. Cas. 1916A 719, the criminal court of appeals held: "It goes without saying that when an attorney or party files a paper, reflecting upon the integrity, fairness, and impartiality of the court, except where the statutes make it grounds for disqualifying the judge, or obtaining a new trial on account of alleged prejudice or bias, or for the purpose of change of venue, he thereby makes himself guilty of a criminal contempt."

In Lamberson v. Superior Court, 151 Cal. 458, 11 L.R.A. (NS) 619, 91 Pac. 100, as to John Bashore, who had executed an affidavit which had been filed in court by his attorney Lamberson, the California Court held: "Indisputably, therefore, John Bashore, upon the face of this record, was guilty of contempt committed in the immediate presence of the court."

In Coons v. State, 191 Ind. 580, 20 A.L.R. 900, 134 N. E. 194, that court in considering such a case as this, said: "It is therefore a high contempt of court for the appellant to have sought to call to account the judge for his judicial acts elsewhere than before a constituted tribunal for impeachment." And: "This document having been filed in open court, if contemptuous at all, was a direct contempt, notwithstanding the persons who presented it had gone to their homes and were

absent from the court at the time its contents became known."

In Re Pryor, 18 Kan. 72, 26 Am. Rep. 747, an attorney addressed a letter to the trial judge containing the following statement: "I can hardly believe that such is the fact, for it is directly contrary to every principle of law governing injunctions, and everybody knows it, I believe." That Supreme Court sustained the judgment of the lower court, and used the following language: "If the language or conduct of the attorney is insulting or disrespectful, and in the presence, real or constructive, of the court, and during the pendency of certain proceedings, we cannot hold that the court exceeded its power by punishing for contempt."

In the case of Blodgett v. Superior Court, 210 Cal. 1, 290 Pac. 293, 72 A.L.R. 482, the verified language employed by petitioner (Blodgett) was that is probably the reason of the basis and prejudice of . . . the Judges of the Supreme Court of California that a fair and impartial trial of the cause cannot be obtained with either of the seven Judges participating as Justices of said Court at a hearing or determination of the proceedings, the above statement referred to orders in a certain cause then pending. In another suit then pending petitioner employed language viz: "The results from oil were found on a member of the President's Cabinet. He insists that his smooth action for the oil company was not caused by the grease found on him. Results from oil have been found on Judge ............... or deputy clerk James, but they could not have worked more smoothly for the oil company if the oil company had carefully oiled them." The Court held that the language employed was contemptuous and affirmed the judgments.

See 17 C.J.S. 37-40, par. 28; 12 Am. Jur. 397-8, par. 13; 6 R.C.L. 490-92, pars. 3, 4 and 5; In re Kelly's Estate, 365 Ill. 174, 6 N.E. (2nd) 113; People v. Andalman, 346 Ill. 149, 178 N.E. 412; Kerr v. State, 194 Ind. 147, 141 N.E. 308; Ex parte Ewell, 71 Cal. App. 744, 236 Pac. 205; United States v. Latter Day Saints, 6 Utah 9, 21 Pac. 503; Myers v. State, 46 Ohio St. 473, 22 N.E. 43; State v. Frew, 24 W. Va. 416, 49 Am. Rep.

257; In re Jenkinson, 93 N.J. Eq. 545, 118 Atl. 240; In re Woolley, 11 Ky. 95.

When a person has been taken into custody under an order of a court exercising proper jurisdiction, a habeas corpus proceeding to discharge the person so taken involves a collateral attack on the order under which he is held and well established rules forbid an investigation into matters of mere irregularity of procedure. The general rule is that where the judgment of a court of general jurisdiction is collaterally attacked, every intendment will be made in support of the jurisdiction unless the contrary affirmatively appears, and this rule applies to judgments and final orders punishing for contempt. A statement filed by the Judge as to matters occurring before him is usually regarded as importing absolute verity. State ex rel. Grebstein v. Lehman, 100 Fla. 481, 129 So. 819; Ex Parte Ed. Senior, Jr., 37 Fla. 1, 19 So. 652; Baumgartner v. Joughin, 105 Fla. 335, 141 So. 185.

It affirmatively appears by the record that the petitioner here was never cited in the court below for contempt and given an opportunity to defend himself against the charges referred to in the order and judgment challenged, as was done in Wilson v. Joughin, 105 Fla. 353, 141 So. 192; Jones v. King, 120 Fla. 87, 162 So. 353, and other Florida cases. Criminal contempts are to be dealt with and tried in a manner analogous to criminal proceedings. Ex parte Grossman, 267 U.S. 87, 45 S. Ct. 332, 69 L. Ed. 527.

Due process of law, in the prosecution of contempt, except that committed in open court and in the presence of the trial Judge, requires that the accused should be advised of the charge and be given a reasonable opportunity to meet it by way of defense or explanation. This includes the assistance of counsel, if requested, and the right to call witnesses to give testimony relevant to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty imposed. Baumgartner v. Joughin, supra; Cooke v. United States, 267 U.S. 517, 69 L. Ed. 767, 45 S. Ct. 390; In re Savin, 131 U.S. 267, 33 L. Ed. 150, 9 S. Ct. 699.

Our analysis of the applicable authorities leads to the

512

conclusion that the truthfulness of the alleged contemptuous statements appearing in the affidavit alleged to have been filed by the petitioner are not material or relevant issues to be heard or inquired into by the lower court and likewise there is no merit to the contention that Judge Stanley Milledge is disqualified, as a matter of law, to hear further and determine the issues involved and the merits of the controversy. The facts in the case at bar are distinguishable from those involved in State ex rel. Grebstein v. Lehman, 100 Fla. 473, 128 So. 811, 110 Fla. 481, 129 So. 818, where a summary judgment was entered without notice and here sustained.

The order and judgment committing the petitioner to the jail of Dade County, Florida, for a period of six months, is hereby vacated and quashed, with directions for further proceedings in the lower court in conformity with the rule as to due process by us enunciated in Wilson v. Joughin, *supra,* and Baumgartner v. Joughin, *supra,* and approved in Cooke v. United States, *supra.*

It is so ordered.

TERRELL, BROWN, ADAMS and SEBRING, JJ., concur.

THOMAS, J., concurs specially.

BUFORD, J., dissents.

THOMAS, J. concurring specially:

I concur in the opinion, and I agree especially to the conclusion because I have the view that the petitioner, Vincent C. Giblin, should be given an opportunity to be heard before the imposition of the sentence.

BUFORD, J., dissenting:

I think the contents of the affidavit were material to the motion to dismiss and were therefore privileged.