336 So.2d 572 (1976)
Ray SANDSTROM, Petitioner,
v.
STATE of Florida, Respondent.
Nos. 47201, 47450.
Supreme Court of Florida.
June 30, 1976.
Rehearing Denied September 23, 1976.
Ray Sandstrom, pro se.
Robert L. Shevin, Atty. Gen., and C. Marie Bernard, Asst. Atty. Gen., for respondent.
PER CURIAM.
The petition for writ of certiorari reflected probable jurisdiction in this Court. We issued the writ and have heard argument of the parties. After hearing argument and upon further consideration of the matter, we have determined that the Court is without jurisdiction. Therefore, the writ of certiorari must be and is hereby discharged.
It is so ordered.
OVERTON, C.J., and ROBERTS, SUNDBERG and HATCHETT, JJ., concur.
ENGLAND, J., dissents with an opinion.
BOYD, J., dissents with an opinion, and concurs with ENGLAND, J.
ADKINS, J., dissents and concurs with ENGLAND, J.
ENGLAND, Justice (dissenting).
By petitions for writs of certiorari directed to the Third and Fourth District *573 Courts of Appeal, we have been asked by Ray Sandstrom, a member of the Florida Bar, to review appellate decisions upholding his two convictions of criminal contempt entered in the trial courts of Dade and Broward County. His first conviction, in Broward County, was affirmed by the Fourth District Court of Appeal in an opinion reported at 309 So.2d 17. His later Dade County conviction was affirmed by the Third District Court of Appeal, on the authority of the earlier case, in a decision reported at 311 So.2d 804. We tentatively granted certiorari to resolve an apparent conflict between these decisions and earlier Florida precedents.[1] As will be developed more fully below, I believe that the conflict of decisions is direct, and that we have jurisdiction to review these two district court decisions.
The conduct of Sandstrom which was found to be contemptuous in each case was for all practical purposes identical. He appeared before a trial court judge, in his capacity as an attorney representing defendants in criminal causes, without a fabric necktie. His personal appearance and attire, which included a suit, clean and pressed shirt, and a hanging gold medallion, were otherwise neat, attractive, and proper. In each case the circuit judge ordered him to don a fabric necktie and recessed the court in order to give him time to comply. In each case Sandstrom refused to alter his attire, and when court reconvened he was cited for contempt and refused permission to represent his clients.[2] The sole reason for the finding of contempt in each case was Sandstrom's refusal to wear a fabric necktie.[3] In Broward County Sandstrom was sentenced to three days in jail. In Dade County he was fined $500.[4]
The Fourth District Court of Appeal affirmed Sandstrom's first conviction after finding that the only issue which could be raised on appeal was whether the Broward County Circuit Court had jurisdiction to order Sandstrom to wear a necktie. Inasmuch as the Third District affirmed the Dade County conviction without explanation and on the authority of the Fourth District's decision, it obviously adopted the same view of its review authority.[5] The determinations of these courts as to the form of appellate review in contempt cases creates the direct conflict with earlier decisions of this Court which requires our clarification.
A first step is to explore whether the district courts had jurisdiction to entertain *574 direct appeals of the contempt citations, and if so whether the appropriate standard of review was applied in these cases.[6] No uniform procedure for reviewing contempt citations has been followed in Florida. In early cases it was held, due principally to statutory limitations on contempt powers, that review could only be had by writ of habeas corpus, and in those cases the only cognizable issue was whether the order of contempt was within the power of the court.[7] In 1931, this Court held in Seaboard Air Line Ry. v. Tampa Southern R.R. that a civil contempt citation would be reviewed on appeal, although criminal contempt remained reviewable only by habeas corpus.[8] Later in Pennekamp v. Circuit Court,[9] the Court expanded the right of appeal to indirect criminal contempt where a fine was levied, as opposed to confinement in jail. Still later, in Clein v. State,[10] we reviewed by appeal an indirect criminal contempt punishable by detention. Habeas corpus, however, was permitted as an alternative means of relief.[11]
The Florida district courts of appeal were created in 1957. From their inception, a diversity of review procedures were permitted. In 1959 the Second District Court of Appeal held that appeal was proper in all contempt cases.[12] Less than four years later the same court held that direct contempt was reviewable by writ of habeas corpus.[13] In 1962 the First District Court of Appeal concluded that appeal was generally unavailable for contempt, but that on consideration of all of the facts in the *575 case before it there were equitable grounds to consider an appeal and alleviate a harsh punishment for indirect criminal contempt.[14] In 1972, the Third District Court of Appeal reviewed by appeal an attorney's citation for direct criminal contempt.[15]
Now, in the two cases before us, the Third and Fourth District Courts have accepted without comment appeals of Sandstrom's convictions of direct contempt. Because Sandstrom has been punished by the levy of a fine in one case and by detention in jail in the other, I feel compelled to clarify the earlier dichotomies and to determine the proper scope and manner of reviewing adjudications of direct contempt.
The availability and scope of appellate review of these identical contempt charges should not depend upon the degree of punishment or coercion which the trial judge elected to impose. To insure that the summary power of contempt is not abused, and to prevent possible inequities on review which could result from the application of different standards, I would hold that direct contempt cases are reviewable in the district courts whether they are brought by appeal or petition for writ of habeas corpus. Indeed, this result seems to be required by the constitutional directive adopted in 1972 that "no cause shall be dismissed because an improper remedy has been sought."[16] It would follow that both district courts were correct in accepting the appeals below.
The more difficult issue in this case is the appropriate scope of review. Florida Appellate Rule 6.16 requires an appellate court to review
"all rulings and orders appearing in the appeal record insofar as it is necessary to do so in order to pass upon the grounds of appeal."
Sandstrom argues that this rule required the district courts to pass on the propriety of the trial courts' first orders, requiring him to appear in court wearing a fabric necktie. The state argues that those orders are not subject to collateral attack on appeal of the direct contempt orders, and that Sandstrom should have appealed the first orders rather than defy them. I agree with the state as a general matter, but I also agree with Sandstrom's assertion that orders which can generate a contempt citation must always be tested for inherent invalidity.
The orders appealed to the district courts were those which declared that Sandstrom had disobeyed an earlier court order in the presence of the court, and summarily adjudicated him guilty of contempt. It has always been the law that knowing and voluntary disobedience of a valid court order is contemptuous.[17] Since the circuit judges had jurisdiction over Sandstrom and he willfully disobeyed their orders, the district courts properly found the contempt citations to be supported in the record. Sandstrom does not dispute their factual foundation. This would end the matter if the underlying court orders, in these cases prescribing Sandstrom's attire, were either unchallenged or unassailable. For example, a general order preventing the possession of loaded firearms in a courtroom would generally be valid and present no question on review if disobeyed.
The district courts here, however, had also to determine whether the orders which Sandstrom disobeyed were valid orders of the trial courts, for if they were not he obviously could not be punished for disobeying *576 them.[18] Neither order directing him to wear a necktie in court was published or rendered, in the approved sense, so as to be generally known and applicable to all attorneys in the respective circuits.[19] Nonetheless, both district courts concluded that trial courts have the power to regulate the attire of attorneys in judicial proceedings, and that the orders requiring Sandstrom to wear a fabric necktie were not void. On the latter point I disagree with the district courts.
Under the Constitution of this state the people of Florida have sought to guarantee to every individual the basic right to choose his or her own lifestyle without undue governmental interference.
"All natural persons are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property... ."[20]
It falls to the courts to guard against improper attempts to exercise governmental authority, whether legislatively, by executive directive or judicially, in areas touched by these guarantees. The fundamental principles are well-established.
"When appealed to in a proper case, the judiciary can render no greater service toward the perpetuation of free government than to accord to an individual litigant before it, however humble his station in society may be, the just protection of our fundamental law, when that protection is sought as a means to forestall aggressive combinations bent on employing the power of statutes to penalize the citizen for his rugged individuality in refusing to surrender his constitutional rights to what may be a contrary minded political majority."[21]
At least one appellate court in this state has recognized that personal grooming and appearance can be an integral part of a person's chosen lifestyle.[22] An individual's manner of dress expresses and reflects ideals personal to him. I do not doubt that in many cases a sense of well-being is derived from an individual's knowledge that he is attired in a manner which is in harmony with his personal views of life, or that the opposite sense of confinement and restriction may attend required adherence to dress codes which the individual finds abhorrent. As petty as clothing might be to some, the individual liberty and free choice which our Constitution recognizes is not dependent upon either a majority or unanimous view as to the significance of any particular right.
This is not to say, of course, that the multitude of rights exercisable in the name of personal liberty are absolute. They can be limited if, taking into account the rights of others or the requirements of a smooth functioning society, substantial justification *577 is shown.[23] The state here argues that control of the judicial process is a substantial, traditional and legitimate justification for restrictions on attire, and that a trial judge must be accorded complete freedom, even in the form of a dress code, to maintain the dignity of the judicial process. The state also argues that the erosion of liberty at stake here, forced fabric neckwear, is a negligible burden on practicing attorneys which is and has been borne by the vast majority of practitioners without complaint.[24] As to the latter assertion, we have previously stated that the suppression of individual liberty frequently takes unobtrusive forms.[25] Consequently, the slight degree of impairment may be a factor to be considered in determining whether the limitation is sufficiently justified, but it does not dispose of the issue.[26]
I agree with the state that control over the administration of justice must include the inherent right to control the courtroom. I do not agree that the power inherent in the right is unlimited.
"Judicial wisdom and the experiences of the past would seem to demand that the extraordinary powers given to courts to punish for contempt be not used except to prevent actual and direct obstruction or interference with the administration of justice."[27]
The only legitimate interest of the courts in requiring attorneys to dress in a particular way is the preservation of the dignity of the judiciary and judicial proceedings. Attire worn by officers of the court must be in harmony with the seriousness of the search for truth and justice. Distracting or bizarre dress, any more than bizarre or distracting behavior,[28] should never be permitted to detract from the attainment of these high goals. When such instances occur it is the duty of the courts to take remedial action. Where those interests are not threatened, however, judicial infringement on personal liberty is just as noxious to our Constitution as any other form of unwarranted governmental intrusion.
"The law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men of fortitude, able to thrive in a hardy climate. `Trial courts . .. must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice.'" (citations omitted)[29]
The predicate for remedial or punitive contempt in matters of dress must be a factual basis from which it can be reasonably concluded that the operation of the judicial process is in imminent peril. In the *578 cases before us, there was no factual basis on which the trial judges could conclude that the mission of the judiciary was threatened by the absence of a tie around Sandstrom's neck. Indeed, both trial courts expressly acknowledged as much.[30] The orders lacked a proper foundation and for that reason must be considered beyond the power of the judges to enter and void.
There are those who will fear that small incursions on the formality of courtroom attire might lead to an erosion of our ability to perform important public work, and in time contribute to a wholly unacceptable courtroom atmosphere. This case does not in fact present an incremental change, let alone one which would inevitably lead to that situation. It is not unusual in the contemporary governmental world for men of high purpose to go about their affairs without a necktie, and it can pose no threat to our judicial system to permit attorneys freedom to adopt the reasonable clothing styles of the time. I reject any inference that respect for the judicial system is dependent upon male attorneys wearing neckties.[31] Surely the dignity of the judiciary rests on more substantial ground.[32]
I would quash the decisions of the Third and Fourth District Courts of Appeal and remand these cases with directions to vacate the contempt citations of the Dade County and Broward County circuit courts.
ADKINS and BOYD, JJ., concur.
BOYD, Justice (dissenting).
I respectfully dissent to the majority opinion and agree fully with the views expressed by Mr. Justice England.
Prior to the second World War both male and female attorneys were expected to wear dark, conservative clothing when appearing in Court, with men usually attired in white shirts and dark ties. During the War the need for women in military service and in defense plants caused a general relaxation of dress codes among women, and the men, including President Harry Truman, began wearing sport shirts in public places. The dress codes for the past thirty years have been so relaxed that it is often difficult to discern whether a person is a man or a woman, especially with the long hair worn by many men. It is common practice for attorneys to appear in courts with bright colored clothing and to demonstrate a relaxed attitude which would have been shocking to courts forty years ago.
For more than twenty-five years men have appeared in public wearing string ties with medal ornaments identical to that worn by petitioner in his court appearances. It is common knowledge that petitioner has appeared in both Federal and State courts on countless occasions dressed in the same kind of tie worn by him on the occasions in which he was cited for contempt. Other judges, including the Supreme Court of Florida, have not been offended by the wearing of the tie and I am totally unable to understand why the wearing of a string tie should offend the trial judges on the occasions resulting in these charges of contempt.
It is interesting to observe that the female Assistant Attorney General who appeared before this Court against petitioner was wearing an attractive coat, shirt and tie which would have been considered extremely unorthodox forty years ago. Apparently if the male petitioner in this instance had been wearing the same coat, *579 shirt and tie worn by the female Assistant Attorney General the trial courts would not have cited him for contempt. The irony of the situation is further illustrated by the fact that if petitioner should become a judge and should determine it proper for all male attorneys to wear string ties when appearing before him, he might well cite all non-conforming members of the Bar for contempt. If trial judges can require male attorneys to wear ties preferred by said judges then those who wear bow ties may require the wearing of bow ties and those who wear blue ties may be offended by those who wear red ties.
Specifically, it is my opinion that judges are not permitted by the Federal or State Constitutions, statutes or rules of court, to hold an attorney in contempt for wearing any type of clothing in courtrooms so long as such clothing does not interfere with the proper administration of justice or demonstrate disrespect for the court or judicial proceedings.
NOTES
[1] Fla. Const. art. V, § 3(b)(3).
[2] In each case Sandstrom filed a motion at the time of his reappearance without a fabric tie, in proper form, asking the trial judge to disqualify himself. Each motion was denied. Although Sandstrom argues the impropriety of those actions, it is not essential to pass judgment on those rulings.
[3] In both cases Sandstrom did later appear before the same trial judge, wearing a fabric necktie, in order to represent his clients.
[4] He was originally fined $500 for each day of non-compliance failing payment of which he would be confined for five days in jail, but without explanation the penalty later became a one-time fine of $500.
[5] Our review of the Third District Court's decision is complicated by a feature of the proceeding in that court which is not present in the other case. The record reflects that when Sandstrom appeared for his scheduled oral argument before the Third District Court he was not wearing a fabric necktie, and for that reason alone the court denied him the right to argue. The panel sitting that day announced it would consider his case on the briefs alone. Sandstrom promptly filed a motion, in proper form, to disqualify the panel on the grounds of obvious prejudice against the merits of his cause. The motion was denied by the panel, and Sandstrom has assigned that denial as error here. Sandstrom's contempt was described in the case as "direct criminal contempt", and he argues that Rule 3.230(d), Fla.Rules Crim.Proc., both operates to restrict a judge's consideration of a disqualification motion to the legal sufficiency of the motion and bars his own adjudication of the question of disqualification. The disposition of these matters I would make precludes the necessity of ruling on Sandstrom's contentions regarding disqualification.
[6] The power to hold persons in contempt is inherent in courts as a necessary element of judicial authority to maintain the dignity of the judiciary and obedience of the law. State ex rel. Giblin v. Sullivan, 157 Fla. 496, 26 So.2d 509 (1946); In Re Hayes, 72 Fla. 558, 73 So. 362 (1916); Ex parte Beville, 58 Fla. 170, 50 So. 685 (1909). "Contempt" is generally classified, to delineate the procedures which may be required, as being "direct" (where the act is committed in the presence of the court and summary adjudication is permissible) or "indirect" (where the act is committed outside the presence of the court and more due process is required). Contempt is also classified, to delineate its purposes, as "civil", (where the goal is to compel or coerce particular conduct) or "criminal" (where the goal is to punish). As an example of a civil contempt case, see Shillitani v. United States, 384 U.S. 364, 368, 86 S.Ct. 1531, 1534, 16 L.Ed.2d 622 (1966) ("In short, if the petitioners had chosen to obey the order they would not have faced jail."). And see Ex-Parte Terry, 128 U.S. 289, 98 S.Ct. 77, 32 L.Ed. 405 (1888); Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911); In re S.L.T., 180 So.2d 374 (Fla.App.2d 1965). I would characterize Sandstrom's convictions as "direct", which eliminates from consideration the due process issues Sandstrom has raised, but it is not clear whether the punishments prescribed are better labeled "criminal" or "civil". See n. 4, above, regarding the coercive nature of the original Dade County punishment. Since I do not deem the characterization controlling as to the consequences, I would not here decide whether it is one, the other, or a hybrid.
[7] Ex parte Edwards, 11 Fla. 174 (1867); Caro v. Maxwell, 20 Fla. 17 (1883). An exception existed for "remedial" rather than "punitive" orders, but no clear statement of how to classify such orders was ever given and apparently the exception was not consistently followed. See Sanchez v. Sanchez, 21 Fla. 346 (1885); Florida Central & Peninsular R.R. v. Williams, 45 Fla. 295, 33 So. 991 (1903); Miller v. Miller, 91 Fla. 82, 107 So. 251 (1926).
[8] 101 Fla. 468, 134 So. 529 (1931). Drawing on the "remedial-punitive" distinction of earlier cases, it was suggested that criminal contempt, being "punitive", was subject only to the limited form of review given petitions for habeas corpus.
[9] 155 Fla. 589, 21 So.2d 41 (1945). This decision implied that habeas corpus was inappropriate because the parties did not request release from improper detention.
[10] 52 So.2d 117 (Fla. 1950). See also Fisher v. State, 248 So.2d 479 (Fla. 1971).
[11] State ex rel. Mitchell v. Kelly, 71 So.2d 887 (Fla. 1954). See also Mitchell v. Parrish, 58 So.2d 683 (Fla. 1952), in which a habeas corpus proceeding before the circuit court was reviewed by appeal.
[12] Puleo v. State, 109 So.2d 39, 44 (Fla.App.2d 1959).
[13] State ex rel. Laramie v. Boggs, 151 So.2d 456 (Fla.App.2d 1963).
[14] Neering v. State, 141 So.2d 615 (Fla.App. 1st 1962), cert. disch'gd, 155 So.2d 874 (Fla. 1963).
[15] Kleinfeld v. State, 270 So.2d 22 (Fla.App.3d 1972), cert. denied, 275 So.2d 251 (Fla. 1973).
[16] Fla. Const. art. V, § 2(a).
[17] See Seaboard Air Line Ry. v. Tampa Southern R.R., 101 Fla. 468, 134 So. 529 (1931).
[18] State ex rel. Everette v. Petteway, 131 Fla. 516, 179 So. 666 (1938). See also State ex rel. Nuveen v. Geer, 88 Fla. 249, 102 So. 739 (1924), holding an official act violating the constitution is void at its inception.
[19] Rule 1.020(e), Fla.Rules Civ.Proc., provides that local rules must be approved by the supreme court. Rule 1.3, Fla.App.Rules, provides that orders are "rendered" when reduced to writing, signed and made a matter of public record by recording or filing. See Barry v. Robson, 65 So.2d 739 (Fla. 1953).
[20] Fla. Const. art. I, § 2.
[21] L. Maxcy, Inc. v. Mayo, 103 Fla. 552, 139 So. 121, 131 (1932) (on rehearing).
[22] Conyers v. Glenn, 243 So.2d 204 (Fla.App.2d 1971) (hair length of students). To the same effect see Johnson v. Joint School District No. 60, 95 Idaho 317, 508 P.2d 547 (1973); Wallace v. Ford, 346 F. Supp. 156 (E.D.Ark. 1972); Dawson v. Hillsborough County School Board, 322 F. Supp. 286 (M.D. Fla.), aff'd, 445 F.2d 308 (5th Cir.1971); Hunt v. Board of Fire Commissioners, 68 Misc.2d 261, 327 N.Y.S.2d 36 (1971). Decisions under the United States Constitution provide some guidance to the interpretation of the Florida Constitution. However, the rights guaranteed by the Florida Constitution are not precisely parallel to those protected by the federal constitution and I do not deal with the federal aspects of Sandstrom's rights in these cases.
[23] See L. Maxcy, Inc. v. Mayo, n. 21 above.
[24] General custom is not proof that neckties have always been worn in courts or that they are uniformly worn in courts today. Informal proceedings, especially in the rural counties of this state and in other forums earlier in our history, are not unknown. With respect to neckties specifically, the state does not contest Sandstrom's unverified statement that he has appeared without a necktie in several federal and Florida courts. It could not, of course, since we have allowed Sandstrom to appear and argue in our Court on more than one occasion in the attire which the lower courts found contemptuous.
[25] See L. Maxcy, Inc. v. Mayo, n. 21 above.
[26] Some of the federal courts addressing the issue of whether schools could regulate the length of hair on males have decided that the right to choose hair length is too insubstantial to support federal jurisdiction. See, for example, Freeman v. Flake, 448 F.2d 258 (10th Cir.1971), cert. denied, 405 U.S. 1032, 92 S.Ct. 1292, 31 L.Ed.2d 489 (1972). Other federal courts have refused to accept that reasoning because "To say that the issue is not `substantial' turns a deaf ear to the basic values of individual privacy and the freedom to caricature one's own image." Bishop v. Colaw, 450 F.2d 1069, 1078 (8th Cir.1971) (concurrence). See also, Stull v. School Board, 459 F.2d 339 (3d Cir.1972); Richards v. Thurston, 424 F.2d 1281 (1st Cir.1970); Breen v. Kahl, 419 F.2d 1034 (7th Cir.1969), cert. denied, 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970).
[27] State ex rel. Giblin v. Sullivan, n. 6 above, 26 So.2d at 516.
[28] In re Dellinger, 370 F. Supp. 1304, 1315 (N.D.Ill. 1973).
[29] In re Little, 404 U.S. 553, 555, 92 S.Ct. 659, 660, 30 L.Ed.2d 708 (1972).
[30] In both cases the matters under court consideration were addressed to the trial judge alone, acting without a jury. No one but the judges themselves evinced offense or pled distraction from the seriousness of the matters being litigated.
[31] Another obvious problem with the orders of the trial courts is their limited application to males, since female attorneys are not prohibited from wearing open-neck dresses or pantsuits.
[32] See, Dobbs, Contempt of Court: A Survey, 56 Cornell L.Rev. 183, 201 (1971).