824 So.2d 154 (2002)
THE FLORIDA BAR, Complainant,
v.
Robert E. HUGHES, Sr., Respondent.
No. SC01-617.
Supreme Court of Florida.
July 11, 2002.
*155 R. Lee Bennett, Chair, Standing Committee on Unlicensed Practice of Law, John F. Harkness, Jr., Executive Director, and Loris S. Holcomb, Unlicensed Practice of Law Counsel, Tallahassee, FL; and Loretta Comiskey O'Keeffe, Branch Unlicensed Practice of Law Counsel, Tampa, FL, for Complainant.
Robert E. Hughes, Sr., pro se, Clearwater, FL, for Respondent.
PER CURIAM.
We have for review a referee's report recommending that Robert E. Hughes, Sr., be found guilty of indirect criminal contempt for engaging in the unlicensed practice of law in violation of this Court's injunction issued in Florida Bar v. Hughes, 697 So.2d 501 (Fla.1997), and also recommending that Hughes be incarcerated for five months. We have jurisdiction. See art. V, § 15, Fla. Const. For the reasons that follow, we approve the referee's findings of fact and conclusions of law, and continue to enjoin Hughes from engaging in the unlicensed practice of law, but we modify the referee's recommended sentence.

FACTS
The Florida Bar filed a complaint against Hughes alleging that he has continued to engage in the unlicensed practice of law, despite this Court's 1997 injunction in Hughes. In that decision, Hughes was enjoined "from counseling, advising and preparing documents for individuals in the creation and transfer of land trusts, or from otherwise engaging in the practice of law in Florida until he is licensed to do so." 697 So.2d at 503.
The referee issued a report in the instant case after conducting proceedings for *156 indirect criminal contempt according to rule 10-7.2(a)(1) of the Rules Governing the Investigation and Prosecution of the Unlicensed Practice of Law. The facts as found by the referee are as follows:
Hughes admitted knowing that, in July 1997, this Court enjoined him from counseling, advising, and preparing documents for individuals in the creation and transfer of land trusts. However, Hughes considers himself an expert in the Illinois-type land trust.[1] Despite the injunction, Hughes advised others, including Mr. Larry Bunting and Mr. Keith Barbour, about land trusts. Also, Hughes has drafted land trust forms that he uses to create or transfer land trusts. Further, Hughes manages property wherein he either has an interest in the property or he is the trustee under a land trust agreement, and he buys and sells real estate either as a beneficial owner or as the trustee.
The Bunting Property. Mr. Bunting purchased property from Mr. Angel Johns, with Bunting providing a mortgage note to Johns. When Johns died, attorney Browder represented Johns' estate, and Bunting made regular mortgage payments to Browder until a fire destroyed the rental units on the property. Browder performed a title search of the property, which revealed that Bunting had transferred the property by quit claim deed to Hughes as trustee under a land trust. Hughes transferred a portion of the property by quit claim deed from the land trust to another land trust and again listed himself as trustee. Attorney Browder filed a foreclosure action on the mortgage note. He served Hughes with the foreclosure action as trustee of the land trusts and he also served Bunting because Bunting signed the mortgage note. Hughes filed an answer, affirmative defenses, and counterclaim to the foreclosure action, and a response to a notice to produce. Hughes indicated in his pleadings to that action that Bunting had been forced to employ Hughes to represent the interests of the trust in the litigation. The referee found that in Hughes' pleadings in the foreclosure action, Hughes alleged cancellation of the note, concealment, fraud, lack of a note from which to foreclose, lack of fire insurance, and failure to disclose, and demanded a trial by jury. Bunting failed to file an answer and a judgment of default was entered against him. Bunting did not answer the foreclosure complaint because he relied upon the letters that Hughes wrote in response to the foreclosure. Although Hughes did not have any ownership interest in Bunting's property, he prepared and signed pleadings in defense of the foreclosure action on Bunting's behalf.
The Barbour Properties. Mr. Barbour met Hughes in July 1997, the month this Court issued its decision enjoining Hughes. At their first meeting, Hughes held himself out as an expert in land trusts and explained to Barbour how land trusts could be used. At their second meeting, Hughes convinced Barbour to use land trusts when purchasing investment property. Hughes told Barbour he would take care of everything and, if there was any litigation or any problems, Hughes would "represent" Barbour. Hughes also told Barbour that there were significant tax benefits to using land trusts.
Barbour relied on Hughes' advice and agreed to go into business with him. From September 1997 to March 1998, Hughes purchased twenty-one properties *157 for Barbour using land trust agreements. Hughes found the properties for Barbour, attended the closings on his behalf, prepared the land trust agreements, collected the rents, and made the mortgage payments. Barbour paid Hughes $3500 commission per property and a yearly $250 trustee fee per property. In 1999, when their business relationship deteriorated, Barbour filed a lawsuit against Hughes seeking to force Hughes to transfer the beneficial interest in the properties back to Barbour.
The Behr Property. In November 1997, Ms. Benita Pagac, a licensed real estate salesperson, represented Mr. and Mrs. Behr in the sale of their home in Pinellas Park, Florida. Pagac received a purchase agreement indicating that Hughes would purchase the Behrs' property and transfer it into a land trust. In her discussion with Hughes, he held himself out as an expert in land trusts and explained how the land trust agreement would operate. Pagac relied on Hughes' representations regarding land trusts and subsequently recommended to the Behrs that they enter into a land trust agreement. Hughes attended the real estate closing wherein the Behrs entered into a land trust agreement with him. Hughes then assigned the Behrs' interest in the land trust to a corporation owned by Barbour.
Hughes told Mrs. Behr that he was acting as a trustee to purchase her property, that he would take over making the payments on the Behrs' home, and that in two years everything would be out of their names. At the closing, Hughes told Mrs. Behr that he could represent the Behrs as an attorney if anything ever happened. As a result of the land trust agreement with Hughes, Mrs. Behr's credit rating dropped drastically and she was denied a second mortgage because the payments on her Pinellas Park property were not made.
Having made the aforementioned findings of fact, the referee determined that Hughes was not and is not a member of The Florida Bar and, therefore, he was not licensed to engage in the practice of law. Based on these findings, the referee found Hughes guilty beyond a reasonable doubt of engaging in the unlicensed practice of law in violation of the injunction. The referee also found that Hughes used the designation of trustee as a means to practice law in Florida by engaging in conduct that included buying, selling, managing, and conveying real property and representing individuals in legal matters when he was not licensed or otherwise authorized to do so. Further, the referee found that the evidence proved beyond a reasonable doubt that Hughes continued to: counsel, advise, and prepare documents for individuals in the creation and transfer of land trusts; hold himself out as an expert in land trust agreements; and allow individuals to rely on him to prepare legal documents that affected important legal rights.
The referee recommended that Hughes be sentenced for indirect criminal contempt of the injunction order of this Court as follows: (1) five months' detention in the Pinellas County Jail; (2) payment of a $500 fine; and (3) costs of the proceeding taxed against Hughes in the amount of $1,923.62. The referee also recommended that Hughes be ordered not to engage in the practice of law and that the injunction enjoining him from engaging in the unlicensed practice of law in Florida shall continue in its present form.
Hughes petitioned for review, raising three issues: (1) whether the referee erred by not granting Hughes' request for a continuance; (2) whether the referee's failure to exclude the testimony of several witnesses violated Hughes' due process rights; and (3) whether the evidence supports *158 the referee's finding that Hughes engaged in the unlicensed practice of law. Further, we examine the referee's recommended sentence.

ANALYSIS
First, Hughes argues that the referee erred by not granting his request for a continuance. He claims that if the referee had granted his request, he would have been able to disprove the charges against him.
In Florida Bar v. Lipman, 497 So.2d 1165 (Fla.1986), Lipman argued that the referee should not have denied his request for a continuance. In upholding the referee's denial of the motion, this Court stated that it is within the sound discretion of a referee to grant or deny a motion for continuance and that "[s]uch a ruling will not be disturbed by this Court absent a clear abuse of discretion." Id. at 1167-68.
Like the attorney in Lipman, Hughes argues that his position might have been better presented before the referee if he had been given more time. Lipman filed his motion for continuance two weeks before the hearing, claiming that he had just received funds to retain counsel. In upholding the referee's decision in Lipman, this Court held that the "referee's denial of this eleventh hour motion cannot be said to constitute a clear abuse of discretion." Id. at 1168.
In the instant case, the Bar filed the petition against the unlicensed practice of law on March 19, 2001. On April 12, 2001, this Court ordered Hughes to appear before the referee at the hearing scheduled for June 15, 2001. On June 13, 2001, two days before the hearing, Hughes filed his motion for continuance, which the referee denied because he concluded that Hughes had waited until the last minute to retain counsel. The referee stated that Hughes knew about the hearing since April 2001, and had sufficient time to secure an attorney and discuss the ramifications involved. Also, Hughes filed his motion for continuance a mere two days before the hearing, even closer to the hearing date than Lipman's "eleventh hour motion." After examining the facts in the instant case and in Lipman, we find that the referee in the instant case did not abuse his discretion and we uphold his denial of the motion for continuance.
Second, Hughes argues that the referee's failure to exclude the testimony of several witnesses violated his due process rights. Hughes claims that the testimonies of Browder, Bunting, Pagac, and Behr are irrelevant because they have nothing to do with the petition and that the referee's consideration of their testimonies violates due process. After making these general claims, Hughes does not supply any facts or arguments to support his position.
In considering Hughes' arguments, we have reviewed the record and we conclude that the process under which these proceedings were held did not violate due process. In State ex rel. Giblin v. Sullivan, 157 Fla. 496, 26 So.2d 509, 518 (1946), this Court held that due process of law in the prosecution of criminal contempt requires that the accused be advised of the charge and be given a reasonable opportunity to meet it by way of defense or explanation, which includes the assistance of counsel, if requested, and the right to call witnesses to give testimony relevant to the issues. These due process requirements were met in the instant case.
Also, the instant proceeding was held pursuant to rule 10 7.2, which states that this Court may issue an order directed to a respondent, stating the essential allegations charged and requiring the respondent to appear before a referee to show *159 why he or she should not be held in contempt for the unlicensed practice of law. A reasonable time must be allowed for the preparation of the defense. The record in the instant case indicates that the procedural due process safeguards required in rule 10-7.2 were followed. The Bar filed the petition against the unlicensed practice of law and prayer for contempt citation on March 19, 2001. Hughes was served with an order that stated the essential allegations charged and required him to appear before the referee to show cause why he should not be held in contempt of court. The hearing was held on June 15, 2001. Because Hughes was given notice of the charges, a reasonable opportunity to prepare a defense, an opportunity to confront the witnesses against him, and could have presented witnesses on his own behalf, we find that his due process rights were not violated.
Hughes also challenges the relevance of the testimonies of these witnesses. However, the record demonstrates that the referee only considered those testimonies as they related to the matters before the referee. Therefore, we find that the testimony was relevant for the referee to determine if Hughes' activities constituted the unlicensed practice of law.
Third, Hughes argues that the evidence does not support the referee's finding that he engaged in the unlicensed practice of law. Hughes argues that Barbour was informed that he needed an attorney and that Barbour actually relied on an attorney to assist him in trust matters. Also, Hughes claims that since this Court's July 1997 ruling, he has worked closely with a licensed Florida attorney who drafts the trust documents and provides the legal advice regarding land trusts.
This Court has held that the referee, as the finder of fact, has the responsibility to weigh the credibility of the witnesses and resolve any conflicts in the evidence. See Florida Bar v. Lipman, 497 So.2d 1165, 1168 (Fla.1986). Further, this Court has stated that in an indirect criminal contempt proceeding, a referee's findings must be approved unless they are erroneous or wholly lacking in evidentiary support. See Florida Bar v. Furman, 451 So.2d 808, 812 (Fla.1984).
In Hughes, 697 So.2d at 503, this Court enjoined Hughes "from counseling, advising and preparing documents for individuals in the creation and transfer of land trusts." The record supports the referee's conclusion that Hughes violated the injunction. This Court has "repeatedly held that the preparation of legal documents by a nonlawyer for another person to a greater extent than typing or writing information provided by the customer on a form constitutes the unlicensed practice of law." Florida Bar v. Miravalle, 761 So.2d 1049, 1051 (Fla.2000). Barbour testified that Hughes continued to complete land trust forms for Barbour and that Hughes did so without the supervision or assistance of an attorney. We find that Hughes also violated the injunction by continuing to advise people "in the creation and transfer of land trusts." Pagac and Behr testified that Hughes advised them about land trusts in relation to the Behr property. Barbour also testified that Hughes advised him about land trusts. Although Hughes might have advised Barbour at one point to get an attorney, and even occasionally consulted with an attorney himself, such actions do not negate the fact that Hughes continued to counsel and advise people about land trusts and draft documents for them. We find that the record supports the referee's findings of fact, which in turn support the referee's conclusion that Hughes continued to engage in the unlicensed practice of law in violation of this Court's order.
Finally, we examine the referee's recommended sentence. This Court has *160 noted that a critical factor in prohibiting the unlicensed practice of law is protecting the public from being advised and represented in legal matters by unqualified persons. See Florida Bar v. Schramek, 616 So.2d 979, 983 (Fla.1993); Florida Bar v. Furman, 376 So.2d 378, 381 (Fla.1979). This Court takes the responsibility of protecting the public very seriously. Therefore, we agree with the referee that the injunction enjoining Hughes from engaging in the unlicensed practice of law should continue in its present form. Hughes' compliance with the injunction is necessary to protect the public.
The referee also recommended that Hughes serve five months' imprisonment and pay a $500 fine. Chapter 10 of the Rules Regulating the Florida Bar governs the investigation and prosecution of the unlicensed practice of law. According to rule 10-7.2(e), if the referee finds the respondent guilty of indirect criminal contempt, "[t]he punishment ... shall be by fine, not to exceed $2500, imprisonment of up to 5 months, or both." Thus, the rules permit imprisonment and a fine for indirect criminal contempt for the unlicensed practice of law.
Further, this Court has ordered imprisonment for individuals who continued to engage in the unlicensed practice of law in violation of an injunction. However, in most of these cases, this Court initially suspended the imprisonment in part or in full conditioned upon the respondent completing other conditions of the sentence successfully. See Florida Bar v. Schramek, 670 So.2d 59, 61 (Fla.1996) (ninetyday imprisonment imposed, but last sixty days of imprisonment suspended contingent on condition that Schramek not further violate the laws of the State of Florida or the prior injunction entered by this Court); Florida Bar v. Valdes, 507 So.2d 609, 610 (Fla.1987) (five-month imprisonment imposed, but imprisonment suspended contingent upon Valdes' successful completion of 100 hours of community service and full compliance with the terms set forth in referee's report); Florida Bar v. Furman, 451 So.2d 808, 816 (Fla.1984) (120-day imprisonment imposed, but last ninety days of imprisonment suspended contingent on condition that Furman not violate for a period of two years the prior injunction entered by this Court); Florida Bar v. Heller, 298 So.2d 357, 361 (Fla.1974) (thirty-day imprisonment imposed, but imprisonment suspended contingent upon payment of $250 fine). Also, in Furman and Heller this Court modified the recommended sentences, demonstrating that this Court has the discretion to impose a sentence that requires the individual to serve only a portion of a recommended period of imprisonment.
We agree with the referee that Hughes should be held in contempt of court. While we do not view Hughes' violations of the injunction lightly, we note that most of Hughes' violations occurred almost five years ago. It appears that he has observed the injunction since that period. Therefore, considering the timing of events in the instant case, we conclude that a less severe sentence is appropriate and we sentence Hughes to ninety days' imprisonment. Further, we suspend execution of that sentence contingent upon Hughes' compliance with the injunction and the other terms recommended by the referee. Because Hughes has violated the injunction in the past, any additional failures to comply with the injunction or the terms set forth herein shall result in enforcement of the ninety-day imprisonment or the imposition of a greater sentence. See Florida Bar v. Valdes, 507 So.2d 609, 610 (Fla.1987); Florida Bar v. Furman, 451 So.2d 808, 815-816 (Fla.1984). We put Hughes on express notice that this Court will not tolerate further violations of the injunction.

*161 CONCLUSION
Accordingly, we agree with the referee that Robert E. Hughes, Sr., continued to engage in the unlicensed practice of law, thereby violating the injunction issued by this Court in Florida Bar v. Hughes, 697 So.2d 501 (Fla.1997). Robert E. Hughes, Sr., is hereby found in indirect criminal contempt and is sentenced to ninety days' imprisonment. However, that sentence is suspended contingent upon Hughes' full compliance with the injunction and the other terms recommended by the referee, including payment of the $500 fine. Further, Hughes shall not engage in the practice of law and the injunction enjoining him from engaging in the unlicensed practice of law in Florida shall remain in effect. Judgment is entered for The Florida Bar, 650 Apalachee Parkway, Tallahassee, Florida 32399, for recovery of costs from Robert E. Hughes, Sr., in the amount of $1,923.62, for which sum let execution issue.
It is so ordered.
ANSTEAD, C.J., and SHAW, HARDING, WELLS, PARIENTE, LEWIS, and QUINCE, JJ., concur.
NOTES
[1] Black's Law Dictionary 1516 (7th ed.1999) defines an Illinois land trust as a "land-ownership arrangement by which a trustee holds both legal and equitable title to land while the beneficiary retains the power to direct the trustee, manage the property, and draw income from the trust."