IN THE MATTER OF THE PROCEEDINGS AGAINST PERCY S. HAYES AND BRYAN MACK FOR CONTEMPT OF COURT.

Opinion Filed Dec. 20, 1916.

1.  The 13th Section of the Declaration of Rights of the Constitution of Florida, which provides that "every person may fully speak and write his sentiments on all subjects being respon-

sible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press," etc. does not secure immunity from punishment to any citizen who falsely and with the purpose to defame, attacks in the newspapers the character of any other citizen, or impugns the integrity, honor and authority of the courts.

2. The exercise of the right to "fully speak and write" one's sentiments on all subjects, a right secured by our constitution, is always subject to the preservation of the governmental authority of the State as conferred by law.

3. This court has the inherent power, independent of statutory authority, to punish as for a direct contempt any person who during the pendency of a cause before this court publishes an article referring to such cause which reflects upon the efficiency and integrity of the court.

4. Publishers of newspapers have the right, but no higher right than others, to publish the conduct of the courts, but such right is limited by the obligation to observe respect for truth and fairness.

5. Under the right of freedom of speech and of the press the public have a right to know and discuss all judicial proceedings, but this does not include the right to attempt, by wanton defamation and groundless charges of unfairness and partisanship, to degrade the tribunal and impair its efficiency.

Original Proceedings for Contempt.

Motion to quash denied.

*John P. Stokes,* for Motion.

PER CURIAM.—This is the first time in the history of Florida that this court has issued a rule against the editor and reporter of a newspaper to show cause why

they should not be attached for contempt because of the publication of a libelous article impugning the integrity, dignity and authority of this court. It is to be hoped that the good sense of our people, their love of order and respect for the institutions of our government will operate to restrain the impulsive and illnatured words of those among us who seem to be so alert to suspect and ready to condemn and that proceedings of this nature may not become necessary in the future to restrain the vicious tendencies of those who traffic in scandal and sensation and which lead them to attacks upon the integrity and authority of our institutions.

It is true that respect to the courts is the voluntary tribute which the people pay to worth, virtue and intelligence and every man who has the honor to occupy judicial position in our government should strive to attain to that standard of judicial purity and efficiency which right thinking people require of their judicial officers; but it is also true that malicious, designing persons may greatly impair the authority and efficiency of our courts by using the powerful arm of the press to scatter abroad suspicion and distrust by unfounded accusations against the intelligence, impartiality, integrity and mental honesty of the judges of our courts of justice.

Such accusations are an insult to the people whose agents the courts are; the injury accomplished is to the institution which the people by their government have established. The author and distributor of such publications therefore is an enemy to his people, a veritable traitor to his government whose protection he enjoys.

Mr. Chief Justice ENGLISH in the case of State v. Morrill, 16 Ark. 384, said: "It was well remarked by counsel, that no court could coerce public respect for its decisions; and we may add that no sane judge would at-

tempt it.   If it were the general habit of the community
to denounce, degrade and disregard the decisions and
judgments of the courts, no man of self-respect and just
pride of reputation would remain upon the bench, and
such only would become the ministers of the law, as
were insensible to defamation and contempt.   But hap-
pily for the good order of society, men, and especially the
people of this country, are generally disposed to respect
and abide the decisions of the tribunals ordained by gov-
ernment as the common arbiters of their rights.   But
where isolated individuals, in violation of the better in-
stincts of human nature, and disregardful of law and
order, wantonly attempt to obstruct the course of public
justice, by degrading and exciting disrespect for the de-
cisions of its tribunals, every good citizen will point
them out as proper subjects of legal animadversion."
"The court looks to the sober judgment of all reflecting
and intelligent men, and to none with more confidence
than the enlightened and liberal conductors of the press,
who, as before remarked, have generally manifested a
disposition to maintain public respect for the judicial
tribunals of the country."

In the case of Watson v. Williams, 36 Miss. 341, the
court said:   "In this country all courts derive their
authority from the people, and hold it in trust for their
security and benefit.   In this State all judges are elected
by the people, and hold their authority in a double
sense directly from them; the power they exercise is but
the authority of the people themselves exercised through
courts as their agents.   It is the authority and law ema-
nating from the people, which the judges sit to exercise
and enforce.   Contempts against these courts in the
administration of their laws are insults offered to the
authority of the people themselves and not to the humble

agents of the law whom they employ in the conduct of their government. The power to compel the lawless offender against decency and propriety, to respect the laws of his country and submit to their authority (a duty to which the good citizen yields hearty obedience without compulsion) must exist, or courts and laws operate at least as a *restraint* upon the upright who need no restraint, and a license to the offenders whom they are made to subdue." How appropriate is this language to our State government whose constitution provides for the election by the people of the judges of our Supreme Court.

In the case of State v. Frew and Hart, 24 West Va. 416, the court said: "We are well aware that the trust reposed in us to protect the people's court from degradation is a *delicate* as well as a sacred trust. The power claimed, it is said, is arbitrary and liable to abuse. That is no reason why the power should not exist and be reposed somewhere. The few instances in which this power has been used during the last century shows that it was wisely placed and may be safely left in the hands of the courts. It is well established by the authorities that the power is inherent in courts of justice to summarily punish constructive as well as direct contempts. And in this country, where the courts are in the divisions of power by the Constitutions of the several States constituted a separate and distinct department of government clothed with jurisdiction and not expressly limited by the constitution in their powers to punish for contempt the inherent power that is thus necessarily granted them cannot be taken away by the legislative department of the government."

For seventy-one years this State has enjoyed the advantages and benefits of Statehood in the government

of the United States and as pointed out herein this is the first time in its history that this court has felt the necessity for the exercise of the power to bring any one before it and punish him for seeking through the public press to destroy its efficiency by shaking the confidence of the people in its integrity. There has been no disposition and there is none now on the part of this court to seek opportunities to exercise this power. It has passed unnoticed some ill-advised criticisms and untrue statements regarding its decisions, deeming them to have originated in the disappointment and poignancy of defeat which calm deliberation and sober thought would rectify in the minds of our people, but this is the first time that it has met a deliberate and meditated insult from the editor and reporter of a newspaper who published an article charging this court with hostility toward counsel, stubbornness, partiality and partisanship in a cause then pending in and being heard and considered by the court. In the conclusion at which we have arrived, we have not forgotten that we have no right in this manner to avenge individual wrongs, although the best years of the lives of some of the judges of our Supreme Court have been given conscientiously to an honorable discharge of the duties devolving upon them; a fair and just consideration of all causes brought before us, and into whose hearts the unkind and malicious thrust of this contemptuous article has sunk with bitter cruelty we remember only the studied injury to the peoples' court, for as Judge Okey Johnson of West Virginia said, "It is a matter of stern and inflexible duty from the performance of which under our official oaths we dare not shrink. For we well know that as the ermine was spotless when we put it on, the people expect us to leave it as untarnished for our successors."

The profession of journalism is a great profession. It has enrolled in its membership some of the brightest minds in the history of our country. It has claimed men of the highest standard of integrity, indefatigable workers for the upbuilding of our common country and the establishment of our splendid institutions. They use the "liberty of the press" as a means for the promotion of all that is good and noble among their fellow men; they discuss in the columns of their publications public questions in a spirit of fairness and always abhor and loathe the methods of those scandal mongers who traffic in sensational stories to their sordid profit. Our people have nothing to fear from the true journalist, our government and our institutions are safely guarded by them in the field of their labors. Nor has the freedom of the press anything to fear from the judiciary in this State. It may be said to the credit of the press in this State that except in very few instances it has upheld and maintained respect for the judiciary. But it is from the operations of the pseudo-journalist that the people expect and receive injury and insult. That class who claiming the protection of that clause in our constitution which provides that "Every person may fully speak and write his sentiments on all subjects" (Declaration of Rights Section 13), dips his pen in the ink of morbid thoughts and with the recklessness born of irresponsibility attacks the integrity and honor of governmental institutions, and the characters of men and women with equal abandon, ignoring the admonition contained in the same section of the Declaration of Rights, *viz*: that they shall be held "responsible for the abuse of that right" to speak and write their sentiments on all subjects.

It was not the purpose of the framers of our constitution nor the people in adopting it to permit any citizen

to attack unjustly in the public prints the character of any other citizen nor to impugn the integrity, honor and authority of our courts with impunity. "There is nothing in the language of the constitution which authorizes one man to impute crimes to another for which the law has provided the mode of trial and the degree of punishment. * * * The true liberty of the press is amply secured by permitting every man to publish his opinions; but it is due to the peace and dignity of society to enquire into the motives of such publications, and to distinguish between those which are meant for use and reformation and with an eye solely to the public good and those which are intended merely to delude and defame. To the latter description, it is impossible that any good government should afford protection and impunity." Chief Justice McKean in Respublica v. Oswald, 1 Dallas (U. S.) 319.

Our government is one of laws. The exercise of any right secured by the organic law is always subject to the lawful rights of other persons in the premises and especially is the exercise of a right by any person subject to the preservation of the governmental authority of the State as conferred by law.

It is of paramount importance that each department of our government should be protected and preserved against the attempts of designing persons to undermine its authority and destroy its efficiency. The Executive branch of our government is charged with the duty of enforcing the law as made by the Legislature and construed by the courts, yet the officers of that branch of the government whose duties are largely, if not entirely, ministerial, are protected by law from interference with the discharge of their duties. The Legislative branch whose acts are subject to the courts' construction has the power vested in it by constitutional provision to punish

by fine and imprisonment any contempt committed in its presence, and so the courts whose duty it is to construe the law and upon whom there is no check save the sovereign power of the people and the conscience, honor, ability and mental honesty of the judges have the inherent power to punish summarily any effort on the part of a citizen to destroy their authority and efficiency. As was said by this court in Ex Parte Edwards, 11 Fla. 174, "It is not to be denied (and the numerous authorities cited at the hearing by the counsel for the contestants abundantly establishes the position), that, in the absence of any statutory limitations or restrictions, the power of the several courts over 'contempts' is omnipotent and its exercise is not to be enquired into by any other tribunal. This is the great bulwark established by the common law for the protection of courts of justice, and for the maintenance of their dignity, authority and efficiency, and neither in England nor in the United States has this unrestricted power been seriously questioned." The Justices of the Supreme Court and Judges of the Circuit Court are liable to impeachment by the House of Representatives for any misdemeanor in office, but for the possession of ability and the exhibition of fairness, impartiality and mental honesty in the trial of causes before them they are responsible to the sovereign people.

The trust reposed by the people of the State of Florida in the Justices of our Supreme Court is the highest and most sacred of all trusts. The property, the liberties and lives of our citizens are rights which constantly are before this court for adjudication and in any cause pending before this court the exhibition by the justices of ignorance, stubbornness, hostility to any party to the cause or his representatives, unfairness, partiality and partisanship would destroy the efficiency and authority of

this court, bring it into contempt of the people and pre-
pare the way for breaches of the peace and possible
bloodshed among our citizens.  Is it reasonable to suppose
that any man who has been honored by the people of his
State with a position upon this tribunal is unmindful of
the sacred trust reposed in him?  Would any fair minded,
honorable citizen of this State having the best interests
of his government at heart seek to destroy the dignity,
influence and efficiency of this court by imputing to the
justices thereof infidelity to their trusts merely because a
decision upon a point of evidence, admitted by opposing
counsel before the court to be correct, happens to run
contrary to the preconceived ideas and wishes of some in-
terested spectators?  Yet the defendants in this proceed-
ing have in a published article referring to a cause then
pending in and being considered by this court, unhesita-
tingly laid at the door of our Supreme Court the charge
of hostility to counsel, stubbornness, ignorance of the
law, partiality and partisanship.  That charge reduced
to its last analysis is nothing less than a charge of preju-
dice, partiality and partisanship practiced by the judges
of this court in their official capacity, and if true deserves
the severest condemnation and seriously impairs the effi-
ciency and authority of this court.  So long as this court
is constituted of men who sincerely desire to administer
justice according to the rules of law it will jealously
guard its integrity by purity of conduct, fairness and im-
partiality in its decisions and the exercise of the best
judgment which their abilities command.  That judgment
may not meet with the approval of self appointed censors
of public morality and civic virtue, but when such persons
so far ignore their loyalty to the government as to at-
tempt the destruction of the efficiency of this court by im-
puting to its judges a lack of integrity and honest purpose,

it will rebuke such conduct to the end that the people may be protected from further insult and injury at the hands of such persons, that due respect for propriety and decency be maintained and the dignity of the court vindicated from the disrespect shown to it:

The Supreme Court has, independent of statutory authority, inherent power to punish for contempt of court. Coleman v. Roberts, 113 Ala. 323, 21 South. Rep. 449; State v. Morrill, 16 Ark. 384; In Re Shortridge, 99 Cal. 526, 34 Pac. Rep. 227, 21 L. R. A. 755; People v. Stapleton, 18 Colo. 568, 33 Pac. Rep. 167, 23 L. R. A. 787; In Re Clayton, 59 Conn. 510, 21 Atl. Rep. 1005, 13 L. R. A. 66; Bradley v. State, 111 Ga. 168, 36 S. E. Rep. 630, 50 L. R. A. 691; Dahnke v. People, 168 Ill, 102, 48 N. E. Rep. 137, 39 L. R. A. 197; Fishback v. State, 131 Ind. 304, 30 N. E. Rep. 1088; Dunham v. State, 6 Iowa 245; In Re Wolfe, 52 Kan. 366, 34 Pac. Rep. 1048; Arnold v. Commonwealth, 80 Ky. 300; Cartwright's Case, 114 Mass. 230; In Re Chadwick, 109 Mich. 588, 67 N. W. Rep. 1071; Watson v. Williams, 36 Miss. 331; Ex Parte Crenshaw, 80 Mo. 447; Ex Parte Moore, 63 N. C. 397; Hale v. State, 55 Ohio St. 210, 45 N. E. Rep. 199, 36 L. R. A. 254; State v. Frew, *supra*, 49 Am. Rep. 257; In Re Debs, 158 U. S. 564, 15 Sup. Ct. Rep. 900; Ex Parte Terry, 128 U. S. 289, 9 Sup. Ct. Rep. 77; Ex Parte Edwards, 11 Fla. 174. Publications concerning a pending cause which reflect upon the court constitute contempt. People v. Stapleton, *supra;* People v. Wilson, 64 Ill. 195; Field v. Thornell, 106 Iowa 7, 75 N. W. Rep. 685; Burdett v. Commonwealth, 103 Va. 838, 48 S. E. Rep. 878, 68 L. R. A. 251; State v. Tugwell, 19 Wash. 238, 52 Pac. Rep. 1056, 43 L. R. A. 717.

Publishers of newspapers have the right, but no higher right than others to bring to public notice the conduct of

the courts, provided the publications are true and fair in spirit. The liberty of the press secures the privilege of discussing in a decent and temperate manner, the decisions and judgments of a court of justice, but the language should be that of fair and honorable criticism, and should not go to the extent of assigning to any party or the court false or dishonest motives. There is no law to restrain or punish the freest expressions of disapprobation that any person may entertain of what is done in or by the courts. Under the right of freedom of speech and of the press the public have a right to know and discuss all judicial proceedings, but this does not include the right to attempt by wanton defamation, groundless charges of unfairness and stubborn partisanship to degrade the tribunal and impair its efficiency. 6 R. C. L. pp. 254-512. "The liberty of the press is subordinate to the independence of the judiciary and it is not expedient that any class in the community should be privileged to attack the courts with the view to interfere with the rights of litigants or to embarrass the administration of justice. Liberty of the press must not be confounded with license or abuse of that liberty." 6 R. C. L. p. 510. Our statute provides that "Every court shall have power to punish contempts against it" etc. Sec. 1345 Gen. Stats. of 1906, Florida Compiled Laws 1914.

The conduct of unprincipled men traducing the institutions of a State to the end that their political ambitions may be realized is an unsafe guide for the young man who desires to succeed in the honored field of journalism and is an example too degrading to be imitated and too vicious to be condoned by the self respecting journalist. He can not fan the flames of suspicion and distrust by printing a false article relating to a cause then pending in court, and imputing to that court a lack of

integrity, without violating the law and transgressing every conception of decency. Newspaper editors and reporters have the right to publish the proceedings of the courts, including the pleadings, proofs and remarks of the court and counsel, yet they must see to it that they publish them truthfully and correctly. But they have no right to give publication to the impressions made by such court proceedings upon their minds by the use with reference to the court itself of such contemptuous and opprobrious adjectives as that the court was "partisan," "stubborn," "hostile to counsel" and "ignorant."

It is the judgment of the court that the writing and publication of the article mentioned and referred to in the rule issued in these proceedings constitute a contempt of court and that the defendants Percy S. Hayes and Bryan Mack are guilty of contempt of this court because of the writing and publication of said article.

The respondents through their counsel interposed a demurrer to the rule issued in this cause which will be treated as a motion to quash. The points presented by the motion are not well taken. The rule is not "process," nor does it come within the provisions of Section 22 of the Declaration of Rights. See State v. Frew, 24 West Va. 416, text 471; Moore's Case, 63 N. C. 397; State v. Morrill, 16 Ark. 384. The truthfulness of the publication and a good motive inspiring it need not be negatived by the rule any more than ignorance of the meaning of words should be. The quoted extracts from the publication constitute the gist of the offense and general statements following may be treated as surplusage. Such a publication as the one under consideration does not come within the constitutional provisions securing the freedom of the press. So the motion to quash is denied.

TAYLOR, C. J., and COCKRELL, WHITFIELD and ELLIS, JJ., concur.

SHACKLEFORD, J., absent.