660 So.2d 313 (1995)
Robert James WALKER, Petitioner,
v.
Honorable E. Randolph BENTLEY, as Circuit Judge of the Tenth Judicial Circuit, Respondent.
No. 95-01084.
District Court of Appeal of Florida, Second District.
August 30, 1995.
*315 James Marion Moorman, Public Defender, and Howard L. Dimmig, II, Assistant Public Defender, Bartow, for petitioner.
Thomas C. MacDonald, Jr. of Shackleford, Farrior, Stallings & Evans, P.A., Tampa, for respondent.
LAZZARA, Judge.
The petitioner, Robert James Walker, seeks a writ of prohibition restraining the respondent circuit judge from exercising jurisdiction in an indirect criminal contempt proceeding initiated to punish him for an alleged violation of a domestic violence injunction issued pursuant to section 741.30, Florida Statutes (Supp. 1994). He contends that the provisions of section 741.30(8)(a), Florida Statutes (Supp. 1994), specifically limit the respondent's jurisdiction to the use of civil contempt to enforce compliance with such an injunction. Because this statute purports to divest the respondent of the jurisdiction to use the power of indirect criminal contempt, prohibition is the appropriate remedy. See Department of Agric. & Consumer Servs. v. Bonanno, 568 So.2d 24 (Fla. 1990). Accordingly, we have jurisdiction.
We deny the writ because, as will be discussed, the legislature has no authority under the doctrine of the separation of powers embodied in article II, section 3 of the Florida *316 Constitution, to limit the jurisdiction of a circuit court in the exercise of its constitutionally inherent power of contempt. Furthermore, although we construe section 741.30(8)(a) in a manner consistent with the constitution, we certify two questions of great public importance regarding its interpretation and constitutionality.

ANALYSIS OF DOMESTIC VIOLENCE LEGISLATION
In 1984, the legislature substantially revised section 741.30, Florida Statutes (1983), by creating a simplified, expedited procedure for obtaining from a circuit court an injunction for protection against domestic violence. See Ch. 84-343, § 10, at 1987-1990, Laws of Fla. (codified at section 741.30, Fla. Stat. (Supp. 1984)). Such an injunction could now "be obtained directly, quickly, without an attorney's help, and at little monetary cost." Office of State Attorney v. Parrotino, 628 So.2d 1097, 1099 (Fla. 1993). The legislature also provided that the court issuing the injunction was required to enforce compliance through "contempt proceedings." § 741.30(9)(a), Fla. Stat. (Supp. 1984).
In 1986, the legislature again amended the statute by providing that the court issuing the injunction "shall enforce" compliance through "civil or indirect criminal contempt proceedings." See Ch. 86-264, § 1, at 1973, Laws of Fla. (codified at § 741.30(9)(a), Fla. Stat. (Supp. 1986)). It also created a statute which criminalized specifically defined willful violations of a domestic injunction and provided that the penalty for such a violation was to be in addition to any penalty imposed for contempt. See Ch. 86-264, § 2, at 1974, Laws of Fla. (codified at § 741.31, Fla. Stat. (Supp. 1986)).
During the 1994 legislative session, the legislature again revised the statutes relating to domestic violence. See Ch. 94-134, §§ 1-6, at 384-391, Laws of Fla. The revised statutes took effect July 1, 1994, and apply to offenses committed on or after that date. See Ch. 94-134, § 36, at 405, Laws of Fla.[1]
In making these revisions, the legislature specifically determined that domestic violence was to "be treated as an illegal act rather than a private matter, and for that reason, indirect criminal contempt may no longer be used to enforce compliance with injunctions for protection against domestic violence." § 741.2901(2), Fla. Stat. (Supp. 1994) (revision underscored). To effectuate this policy change, it provided that "[t]he state attorney in each circuit shall adopt a pro-prosecution policy for acts of domestic violence[]" and that "[t]he filing, nonfiling, or diversion of criminal charges shall be determined ... over the objection of the victim, if necessary." Id. (revision underscored). The legislature also expanded the incidents giving rise to a criminal prosecution for violating a domestic violence injunction and increased the penalty for such a violation from a misdemeanor of the second degree to a misdemeanor of the first degree. Compare § 741.31, Fla. Stat. (1993) with § 741.31, Fla. Stat. (Supp. 1994). It eliminated, however, the provision that the penalty for such a criminal violation was to be in addition to any penalty imposed through contempt proceedings. Id.
With respect to the judiciary's role in the enforcement process, the legislature manifested a clear intent that a circuit court could now only "[e]nforce, through a civil contempt proceeding, a violation of an injunction for protection against domestic violence which is not a criminal violation under s. 741.31." § 741.2902(2)(g), Fla. Stat. (Supp. 1994). It substantively codified this intent in section 741.30(8)(a), which provides in part that "[t]he court shall enforce, through a civil contempt proceeding, a violation of an injunction for protection which is not a criminal violation under s. 741.31." (Emphasis added.) This revision purported to divest the circuit courts of their previous statutory authority to use an indirect criminal contempt proceeding as one of the methods to enforce compliance with any violation of a domestic violence injunction. See § 741.30(9)(a), Fla. Stat. (1993).[2]
*317 We glean from these revisions the legislature's clear intent to prosecute and punish substantive violations of domestic violence injunctions through traditional means of criminal prosecution in the county courts rather than through the use of indirect criminal contempt proceedings by the circuit courts that issue the injunctions. We also perceive the legislature's intent to limit circuit courts to the use of civil contempt as the means of punishing violations that do not fall within the criminal ambit of section 741.31. See In re Report of the Comm'n on Family Courts, 646 So.2d 178, 180 (Fla. 1994). While such a legislative approach to combat an ongoing societal problem may be laudable, we conclude that to the extent it infringes on the time-honored and well-recognized constitutional authority of a circuit court to punish by indirect criminal contempt an intentional violation of a court order, it violates the doctrine of the separation of powers embodied in article II, section 3 of the Florida Constitution. Our conclusion is based on the following analysis.

PRELIMINARY COMMENTS
We initially note that in In re Report, the Florida Supreme Court addressed the "administrative Frankenstein" created by chapter 94-134, pointing out that "it has placed the violation of some provisions of domestic injunctions in the jurisdiction of the criminal division of county courts while the violations of other provisions in the injunction remain in the family law divisions of the circuit courts." 646 So.2d at 180. One interesting aspect noted by the court was the possibility that the circuit court judge who issued the injunction may have to appear as a prosecution witness in the county court criminal proceeding. Significantly, although not addressing the issue, the court foresaw that "[a] separation of powers issue exists as to whether the legislature has the authority to completely eliminate the judicial power of indirect criminal contempt to punish those who violate judicial orders." Id. at n. 1.
The legislature may have foreseen this separation of powers problem because, in the recently concluded 1995 session, it once again purported to restore the criminal contempt power to a circuit court to enforce a violation of a domestic injunction occurring on or after July 1, 1995. See Ch. 95-195, § 5, at 1400, Laws of Fla. Notwithstanding this legislative change of mind, however, the separation of powers issue inherent in section 741.30(8)(a), Florida Statutes (Supp. 1994), remains viable for offenses, such as petitioner's, occurring between July 1, 1994, and July 1, 1995. Accordingly, the doctrine of mootness does not preclude us from addressing that issue in this case because our decision will not only affect the rights of the petitioner, it will also affect a significant number of other individuals who occupy the same status as petitioner, thereby determining a question of great public importance in the realm of a pressing social problem. See State v. Kinner, 398 So.2d 1360 (Fla. 1981).

CONTEMPT POWER ANALYSIS
We begin our substantive analysis by noting that many years ago the Florida Supreme Court made it clear that under the power vested in the judicial branch of government by article V, section 1 of the Florida Constitution, courts of this state "are by the law protected from insult and interference, for the purpose of giving them their due weight and authority in performing their judicial functions in the interest of orderly government." Ex parte Earman, 85 Fla. 297, 313, 95 So. 755, 760 (1923). Thus, it concluded that under our constitutional form of government, the judiciary has the "inherent power by due course of law to appropriately punish by fine or imprisonment or otherwise, any contempt that in law constitutes an offense against the authority and dignity of a court or judicial officer in the performance of judicial functions." Id. (emphasis added). The court then defined the various species of contempt punishable by this "inherent power" to be "direct or indirect or constructive, or criminal or civil, according *318 to their essential nature." Id. (emphasis added).
Under Earman, therefore, circuit courts established under the provisions of article V of the Florida Constitution have inherent constitutional authority to invoke the power of indirect criminal contempt under appropriate circumstances. Of course, in invoking this power in the modern era, courts must now strictly comply with the procedural requirements of Florida Rule of Criminal Procedure 3.840 governing the prosecution of indirect criminal contempts,[3] as well as scrupulously afford the alleged contemnor the full panoply of constitutionally mandated protections applicable to criminal proceedings. See, e.g., International Union, United Mine Workers of America v. Bagwell, ___ U.S. ___, ___-___, 114 S.Ct. 2552, 2556-2557, 129 L.Ed.2d 642 (1994); Aaron v. State, 284 So.2d 673, 677 (Fla. 1973).
The supreme court subsequently observed that the power to punish for contempt exists independently of any statutory grant of authority as essential to the execution and maintenance of judicial authority. Ducksworth v. Boyer, 125 So.2d 844, 845 (Fla. 1960); see also In re Hayes, 72 Fla. 558, 568, 73 So. 362, 365 (1916) (recognizing inherent power of supreme court, independent of statutory authority, to punish for contempt of court). The court later determined, in reliance on Earman and Ducksworth, that a juvenile court had the inherent authority to invoke its power of indirect criminal contempt to punish a juvenile for willful disobedience of its order. R.M.P. v. Jones, 419 So.2d 618, 620 (Fla. 1982), receded from on other grounds, A.A. v. Rolle, 604 So.2d 813 (Fla. 1992); see also T.D.L. v. Chinault, 570 So.2d 1335, 1337 (Fla. 2d DCA 1990), approved, 604 So.2d 813 (Fla. 1992) (inherent power of court to punish for contempt not extinguished because offender is a juvenile).
More important, in State ex rel. Franks v. Clark, 46 So.2d 488 (Fla. 1950), the court made it abundantly clear that because the legislature has statutorily conferred the general power of contempt on the judiciary does not mean it has the corresponding authority to later withdraw that power. As the court stated:
We take notice of [section 38.22, Florida Statutes (1949)] but do not construe it inasmuch as we are able to uphold the order without the benefit of the legislative act. A grant of power to a court is tempting but the acknowledgment of it presupposes the authority to withdraw same.
46 So.2d at 489.[4]See also A.A. v. Rolle, 604 So.2d 813, 820 (Overton, J., dissenting) (legislature without authority to eliminate inherent power of contempt from constitutionally created circuit court).
In view of this analysis, it is readily apparent that although the legislature at one point purported to vest the circuit courts with the power of indirect criminal contempt to enforce compliance with a domestic violence injunction, its attempt to do so constituted mere statutory surplusage because such courts already had the inherent constitutional authority, independent of any specific statutory grant, to invoke this power for willful disobedience of any of their orders. It follows, therefore, that the legislature had no authority at a later point to withdraw the power of indirect criminal contempt because a power the legislature cannot confer in the first instance cannot be taken away. See State ex rel. Franks v. Clark, 46 So.2d 488; see also M.C. Dransfield, Annotation, Legislative Power to Abridge, Limit, or Regulate Power of Courts with Respect to Contempts, 121 A.L.R. 215, 216 (1939) (stating general rule "that the legislature cannot abridge or destroy the judicial power to punish for contempt, since a power which the legislature does not give, it cannot take away."). Accordingly, the respondent's use of section 741.30 as the sole basis for issuing the injunction did not limit him to the use of the species of contempt provided for in the statute because, as noted, the legislature had no *319 authority in the first instance to control the type of contempt to be used in enforcing compliance with such an injunction.
We are aware, however, that early in Florida's history the supreme court recognized the legislature's authority, for the protection of personal liberty, to limit and restrict the "omnipotent" common law powers of the courts in terms of the punishment to be imposed for the class of contempts described as punitive in character. Ex parte Edwards, 11 Fla. 174, 186 (1867).[5] In continuing recognition of this concept, the court, relying on Edwards, recently held that "the sanctions to be used by the courts in punishing contempt may properly be limited by statute." A.A. v. Rolle, 604 So.2d 813, 815 (Fla. 1992) (emphasis in original). In reaching this conclusion, however, it carefully pointed out that the issue to be decided was not the inherent power of a court to adjudicate for contempt, but how and to what extent the legislature intended the contempt to be punished. Thus, the court continued to adhere to the fundamental proposition that courts have inherent power to make a finding of contempt. Id.[6]
We construe Edwards and Rolle to mean that the legislature has the authority to prescribe the punishment a court may impose after it exercises its inherent power of contempt. We do not construe them to hold, however, that it has the authority to bar the use of the contempt power altogether. We perceive, in that regard, a substantive difference between the legislature's authority to determine the sanctions to be imposed for contempt and a circuit court's inherent constitutional power to determine the species of contempt it chooses to use to enforce its orders and vindicate its authority. We conclude, therefore, that the legislature's authority to restrict the sanctions which courts may impose after a finding of contempt does not give it the concomitant authority to completely eliminate the power itself. See State ex rel. Franks v. Clark, 46 So.2d 488.
We note that Florida is not alone in espousing this fundamental doctrine. Other states with constitutionally created courts also recognize this concept. See, e.g., State ex rel. Oregon State Bar v. Lenske, 243 Or. 477, 495, 407 P.2d 250, 256 (Or. 1965) (and cases and authorities cited) (holding that "the power of a constitutionally established court to punish for contempt may be regulated within reasonable bounds by the legislature but not to the extent that the court's power is substantially impaired or destroyed."), cert. denied, 384 U.S. 943, 86 S.Ct. 1460, 16 L.Ed.2d 541 (1966) (emphasis added). Significantly, even in the federal system, where the inferior courts are established by Congress,[7] the United States Supreme Court recently reaffirmed that "while the exercise of the contempt power is subject to reasonable regulation, `the attributes which inhere in that power and are inseparable from it can neither be abrogated nor rendered practically inoperative.'" Young v. United States ex rel. Vuitton Fils S.A., 481 U.S. 787, 799, 107 S.Ct. 2124, 2133, 95 L.Ed.2d 740 (1987) (quoting Michaelson v. United States, 266 U.S. 42, 66, 45 S.Ct. 18, 20, 69 L.Ed. 162 (1924)) (emphasis added).
Finally, the fact that the legislature has created criminal sanctions for specifically-defined violations of a domestic injunction does not deprive a circuit court of its inherent power to punish these same violations by indirect criminal contempt. We find support for this conclusion in Baumgartner v. Joughin, 105 Fla. 335, 341, 141 So. 185, rehearing denied, 107 Fla. 858, 143 So. 436 (1932), in which the facts clearly demonstrate that the defendant was found in indirect criminal contempt for jury tampering and sentenced to a term of imprisonment. In denying the *320 petition for writ of habeas corpus, the court stated:
The fact, also, that jury tampering is by statute (Comp.Gen.Laws 1927 § 7483) made an indictable offense, for which the accused may be prosecuted criminally, does not deprive the court of its inherent power to punish the guilty party for contempt.
105 Fla. at 341, 141 So. at 188 (emphasis added). We recognize, however, that given the judicial evolution in the law since Baumgartner, the Double Jeopardy Clause may now prohibit the imposition of dual punishments in such a factual setting. See United States v. Dixon, ___ U.S. ___, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993).

SEPARATION OF POWERS ANALYSIS
Against this backdrop, we note the fundamental proposition espoused in this state that "`the courts have authority to do things that are absolutely essential to the performance of their judicial functions[.]'" Makemson v. Martin County, 491 So.2d 1109, 1113 (Fla. 1986), cert. denied, 479 U.S. 1043, 107 S.Ct. 908, 93 L.Ed.2d 857 (1987) (quoting Rose v. Palm Beach County, 361 So.2d 135, 137 (Fla. 1978)). An essential corollary to the preservation of this judicial authority is the principle that "[a]ny legislation that hampers judicial action or interferes with the discharge of judicial functions is unconstitutional." Simmons v. State, 160 Fla. 626, 628, 36 So.2d 207, 208 (Fla. 1948) (quoting 11 Am.Jur. 908). These precepts have their genesis in the doctrine of the separation of powers, which has as its goal the preservation of the inherent powers of the three branches of government and the prevention of one branch from infringing on the powers of the others to the detriment of our system of constitutional rule. Daniels v. State Rd. Dep't, 170 So.2d 846 (Fla. 1964).
The citizens of this state have expressly codified this doctrine in article II, section 3 of the Florida Constitution, thereby adopting one of the doctrine's fundamental prohibitions that "no branch may encroach upon the powers of another." Chiles v. Children A, B, C, D, E, and F, 589 So.2d 260, 264 (Fla. 1991). To achieve this constitutional goal of separation of governmental powers, the courts of this state are charged with diligently safeguarding the powers vested in one branch from encroachment by another. Pepper v. Pepper, 66 So.2d 280 (Fla. 1953).
Given our analysis of the law of contempt in conjunction with this constitutional framework, we conclude that the legislature's attempt by the use of the word "shall" in section 741.30(8)(a), to limit the judiciary's authority to civil contempt proceedings for the enforcement of domestic violence injunctions contravenes article II, section 3 of the Florida Constitution. Such a restriction, if given mandatory effect, would constitute an unconstitutional infringement on a court's inherent power, historically rooted in our constitution, to carry out the judicial function of punishing by indirect criminal contempt an individual who has intentionally violated an order of the court. See Bowen v. Bowen, 471 So.2d 1274 (Fla. 1985); see also Fernandez v. Kellner, 55 So.2d 793 (Fla. 1951) (court's power and authority to punish by contempt a willful violation of an injunction cannot be questioned), appeal dismissed, 344 U.S. 802, 73 S.Ct. 40, 97 L.Ed. 625 (1952).

CONSTITUTIONAL ANALYSIS OF SECTION 741.30(8)(a), FLORIDA STATUTES (SUPP. 1994)
We are mindful, however, of the basic principles of statutory analysis that we are to presume that the legislature intended to enact a constitutionally valid law and that we have a duty to interpret a statute so that it withstands constitutional scrutiny. E.g., State v. Deese, 495 So.2d 286 (Fla. 2d DCA 1986). At first blush, such a task seems insurmountable because the legislature has manifested a clear intent within the context of the revised statutory scheme to ascribe a mandatory connotation to the use of the word "shall" in section 740.30(8)(a). See, e.g., S.R. v. State, 346 So.2d 1018 (Fla. 1977). Thus, although we recognize our duty to give effect to the legislature's intent, nevertheless, to uphold the constitutionality of the statute, we must look to the rule of law that when the legislature uses the word "shall" in prescribing the action of a court in a field of operation where the legislature has no authority to *321 act, the word is to be interpreted as permissive or directory, rather than mandatory. Rich v. Ryals, 212 So.2d 641 (Fla. 1968); Simmons, 160 Fla. 626, 36 So.2d 207.
In reliance on this principle, we conclude that the legislature's use of the word "shall" in section 741.30(8)(a), Florida Statutes (Supp. 1994), must be interpreted to mean "may" and, as such, is merely directory. See State ex rel. Harrington v. Genung, 300 So.2d 271 (Fla. 2d DCA 1974). Given this interpretation, we specifically hold that a circuit court has the inherent authority, if it so chooses in its discretion, to enforce compliance with a domestic violence injunction issued pursuant to section 741.30, Florida Statutes (Supp. 1994), by means of an indirect criminal contempt proceeding. We further hold that the fact the alleged violation of the injunction may also constitute a criminal offense under section 741.31, Florida Statutes (Supp. 1994), does not preclude the use of the power of indirect criminal contempt. In making this determination, however, the court must be mindful of the implications of the Double Jeopardy Clause. See, e.g., Hernandez v. State, 624 So.2d 782 (Fla. 2d DCA 1993).

CONCLUDING COMMENTS AND CERTIFIED QUESTIONS
Like the supreme court, we too "recognize the extreme importance of having domestic violence issues addressed in an expeditious, efficient, and deliberative manner[] [and] ... do not want these important issues to become bogged down in an administrative morass[,]" which may be occurring as a consequence of the 1994 statutory revisions. In re Report of Comm'n on Family Courts, 646 So.2d at 182. Accordingly, because our decision has statewide significance in an area involving how to best address one of the most serious problems confronting our society  violence within the domestic context  we certify the following questions of great public importance:
IS THE WORD "SHALL" AS USED IN SECTION 741.30(8)(a), FLORIDA STATUTES (SUPP. 1994), TO BE INTERPRETED AS MANDATORY RATHER THAN AS PERMISSIVE OR DIRECTORY?
IF INTERPRETED AS MANDATORY, IS SECTION 741.30(8)(a), FLORIDA STATUTES (SUPP. 1994), AN UNCONSTITUTIONAL ENCROACHMENT ON THE CONTEMPT POWER OF THE JUDICIARY IN VIOLATION OF ARTICLE II, SECTION 3 OF THE FLORIDA CONSTITUTION?
Petition denied. Questions certified.
FULMER, J., concurs specially with opinion.
ALTENBERND, A.C.J., dissents with opinion.
FULMER, Judge, concurring specially.
Although I find the reasoning and weight of authority set forth in the dissent persuasive, I concur with Judge Lazzara because I believe the statute that we are examining reached too far and imposed an impermissible restriction on the inherent power of the court.
If all violations of domestic violence injunctions were criminal offenses, I would be inclined to concur with Judge Altenbernd because I agree that the legislature is not barred by the separation of powers doctrine from substituting one sanction available to punish conduct falling within the definition of indirect criminal contempt for another. I would also be inclined to agree that the courts should defer to the legislative scheme created by chapter 94-134, Laws of Florida, for dealing with domestic violence. After all, the legislature created this specialized injunctive relief in response to the growing problem of domestic violence in our communities. It is only because of the legislature's response to the pleas for help that the courts have become active in addressing the needs of victims and families involved in abusive relationships. Both branches of government are now working together to solve this societal problem. Nevertheless, even though I agree that the legislative branch is best equipped to debate and decide public policy issues, I believe the question we are addressing is one of separation of powers, not one of public policy.
*322 I am sure that the legislature did not intend to create a separation of powers question when it amended the statutes relating to domestic violence during the 1994 session. The declaration of intent language set forth in section 741.2901(2), Florida Statutes (Supp. 1994), makes it clear that the focus of the amendment was, understandably, on threats and acts of violence. However, the provision that "indirect criminal contempt may no longer be used to enforce compliance with injunctions for protection against domestic violence" applies not only to violations that would now be deemed misdemeanor offenses, but also to non-criminal violations as well. This legislative intent is implemented in section 741.30(8)(a), Florida Statutes (Supp. 1994), which provides in part that "[t]he court shall enforce, through a civil contempt proceeding, a violation of an injunction for protection which is not a criminal violation under s. 741.31." Herein lies the separation of powers problem that most concerns me.
Domestic violence injunctions are typically orders that both command certain acts (e.g., leave the residence; pay child support; attend counseling) as well as forbid others (e.g., have no contact of any kind with the petitioner; do not go on or near the residence or place of employment of the petitioner). Civil contempt may only be used to coerce compliance with a specific directive in a court order. It may not be used to punish past violations. See Bagwell, ___ U.S. ___, 114 S.Ct. 2552. Thus, the only violations of domestic violence injunctions that may be addressed by the use of civil contempt are those where a required act has not been performed, such as a failure to participate in court-ordered counseling.
Even in those cases where civil contempt could be lawfully used, it would rarely provide realistic sanctions. I suspect that few judges would incarcerate a party in order to coerce attendance at counseling if the incarceration would cause a loss of employment that would then result in the termination of child support payments. A civil contempt fine would be useful only if it really coerced compliance. Based on my experience as a trial judge, I do not believe the imposition of a daily fine would even be available in many cases to coerce compliance because most of the parties who appear in court for enforcement proceedings have a limited ability to pay such a fine and purge themselves of the contempt. Of course, if they do not have the present ability to pay the fine imposed, the fine becomes punitive and unlawful. Bowen v. Bowen, 471 So.2d 1274 (Fla. 1985). Even in those cases where financial ability is not a factor, the use of coercive fines would require the implementation of yet another enforcement program that would severely impact the already burgeoning caseloads of the judiciary.
Finally, and perhaps more important, the most common violations of domestic violence injunctions are those where prohibited acts are committed and not those where a compelled act has not been performed. Civil contempt is not available to sanction such violations. A general prohibition against future acts (e.g., have no contact of any kind) does not lend itself to enforcement through civil contempt since no single act, or the cessation of a single act, can demonstrate compliance and thereby operate as the purge that is required in all civil contempt coercive sanctions. See Bagwell, ___ U.S. ___, 114 S.Ct. 2552.
Thus, as a result of the 1994 amendments, no sanction is available to punish the offender who violates a domestic violence injunction by committing a prohibited non-criminal act. In the circuit court, I found that this type of violation was a large and significant class of cases. For example, I saw many partners in abusive relationships who were terrified or tormented by receiving a greeting card or letter in the mail that would otherwise appear harmless or even loving. Even though such communication may be prohibited as part of a domestic violence injunction, an intentional violation of this provision does not constitute a criminal offense under the 1994 statute. Therefore, no criminal prosecution is available and civil contempt offers no sanction to punish this past wrongdoing. By removing the criminal contempt sanction, the legislature eliminated the only means of punishing these violations which often signal the continuation or escalation of abusive behavior. *323 Eliminating the ability of the court to punish such non-criminal violations with criminal contempt sanctions not only impinges upon the inherent power of the court, but also actually undermines the protective purpose of the legislation. This supposedly unintended result may be part of the reason that the legislature again amended the statute in 1995 to restore the court's use of criminal contempt as an available sanction against violations of domestic violence injunctions. The recent amendments also add the very types of previously non-criminal acts that are so often the basis of the violations to the list of acts that are now deemed a misdemeanor.[8]
I do appreciate the fact that at common law the contempt powers were much more narrow than the contempt powers exercised in the courts of modern America. And, I am tempted by Judge Altenbernd's suggestion that we should be most cautious about invoking our inherent powers to safeguard a contempt power that is not expressly recognized in our constitution and that did not exist at common law. Nevertheless, because the indirect criminal contempt power of our circuit courts does not derive from the legislature, it may not be totally removed by the legislature. Michaelson v. United States ex rel. Chicago, St. Paul, Minneapolis & Omaha Ry., 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162 (1924); Ex parte Earman, 85 Fla. 297, 95 So. 755 (1923). Unlike the legislation involved in Rolle, the 1994 amendments do not just prescribe "how and to what extent the courts may punish criminal conduct, including contempt." Id. at 815. Rather, they purport to remove the authority of the court to use indirect criminal contempt to punish any violation of a domestic violation injunction. Therefore, I concur with Judge Lazzara because I believe the legislature is without authority to eliminate the inherent power of indirect criminal contempt which our constitutionally created circuit courts possess.
ALTENBERND, Acting Chief Judge, dissenting.
The majority opinion is well researched and persuasively presented.[9] Nevertheless, I would grant this petition and issue a writ of prohibition. Domestic violence in our homes and on the streets of our communities is a serious social problem, but it is one within the overlapping constitutional domain of the legislature and the judiciary. Indirect criminal contempt is not an express constitutional power granted to the judiciary, but rather an implied power. As a result, the courts must honor this unambiguous statute unless the legislature's action unquestionably deprives the courts of a contempt power essential to the existence of the judicial branch or to the orderly administration of justice. I agree that the legislature used poor judgment when it revised the enforcement procedures for this statutory injunction. Poor judgment is not unconstitutional. During this one-year experiment, the legislature's enforcement mechanism for misconduct outside the courtroom did not deprive the courts of any essential power. See In re Robinson, 117 N.C. 533, 23 S.E. 453 (1895) (upholding statutory limitations on indirect contempt because such power was not "absolutely essential" to the judiciary).

I. A CLEAR INTRUSION INTO AN ESSENTIAL JUDICIAL POWER MUST EXIST BEFORE A COURT INVOKES SEPARATION OF POWERS AS A SWORD AGAINST THE LEGISLATURE IN A DOMAIN SHARED BY BOTH
A clear violation of the constitutional provisions dividing the powers of government into departments should be checked and *324 remedied; but where a reasonable doubt exists as to the constitutionality of a statute conferring power, authority, and duties upon officers, the legislative will should be enforced by the courts to secure orderly government and in deference to the Legislature, whose action is presumed to be within its powers, and whose lawmaking discretion within its powers is not reviewable by the courts.
State v. Atlantic Coast Line R.R. Co., 56 Fla. 617, 47 So. 969 (1908). See also State v. Johnson, 345 So.2d 1069 (Fla. 1977); 16 Am.Jur.2d Constitutional Law §§ 297-299 (1979).
In this case, the legislature did not confer added power to the circuit court, but rather conferred additional power to the county court and limited a power of the circuit court. Even in this context, we should defer to the will of the legislature unless this allocation of power violates separation of powers beyond a reasonable doubt.
Separation of powers is not a doctrine comparable to res judicata, respondeat superior, or other well-established rules used to determine the outcome of a lawsuit. It is a political doctrine applicable to all three branches of government.
At the bottom of our problem lies the doctrine of the separation of powers. That doctrine embodies cautions against tyranny in government through undue concentration of power. The environment of the Constitution, the debates at Philadelphia, the writings in support of the adoption of the Constitution, unite in proof that the true meaning which lies behind "the separation of powers" is fear of the absorption of one of the three branches of government by another. As a principle of statesmanship the practical demands of government preclude its doctrinaire application. The latitude with which the doctrine must be observed in a work-a-day world was steadily insisted upon by those shrewd men of the world who framed the Constitution and by the statesman who became the great Chief Justice.
....
In a word, we are dealing with what Sir Henry Maine, following Madison, calls a "political doctrine," and not a technical rule of law. Nor has it been treated by the Supreme Court as a technical legal doctrine. From the beginning that Court has refused to draw abstract, analytical lines of separation and has recognized necessary areas of interaction.
Felix Frankfurter & James M. Landis, Power of Congress Over Procedure in Criminal Contempts in "Inferior" Federal Courts  A Study in Separation of Powers, 37 Harv. L.Rev. 1010, 1012-14 (1924).
Although Justice Frankfurter was discussing separation of powers under the United States Constitution, I see no reason to conclude that the Floridians who expressly included separation of powers within our state constitution were less shrewd or less practical. This constitutional clause serves the major political purpose of deterring undue concentration of power in any one branch of government.[10] As discussed by Professor Tribe, the objective is to balance the "independence and integrity of one branch" against "the interdependence without which independence can become domination." Laurence H. Tribe, American Constitutional Law § 2-2 (2d ed. 1988).
Most of the Florida precedent discussing separation of powers concerns the allocation of power between the legislative and executive branches of government. When the judiciary arbitrates such a separation of powers dispute, it performs its usual task of constitutional judicial review. By contrast, when the judiciary invokes the separation of powers doctrine to declare that the legislative or executive branch is powerless to alter a judicial function, it performs the same review  but with a vested interest. This conflict of interest may be unavoidable, but it should compel courts to proceed with great caution and conservatism. In this political context, if there is any reasonable doubt concerning the constitutionality of legislation *325 that curbs judicial power, then judges should defer to the wisdom of the elected representatives. If the judiciary can honor the policy of the legislature with no substantial harm to its existence or operation, then it should not override the duly enacted policy or change a clear legislative "shall" into a judicial "may."

II. THE PUNISHMENT FOR VIOLATIONS OF THESE STATUTORY INJUNCTIONS IS AN OVERLAPPING CONSTITUTIONAL DOMAIN
The prevention and deterrence of domestic violence in places other than the courtroom are not matters exclusively within the powers of either the judicial or legislative branch of government. The overlap of power in this case has several dimensions.
First, the legislature created the injunction for protection against domestic violence because the existing judicial injunctive remedies were too slow and cumbersome to combat this social problem. The courts may have alternative nonstatutory theories upon which an injunction could be entered in some of these cases, allowing for enforcement through indirect criminal contempt. But if the court's order relies upon a statutory basis for an injunction, I see no constitutional reason why the court cannot limit its penalties to those mandated by statute.
Second, the legislature obviously has constitutional authority to enact statutes defining criminal offenses. The restrictions in chapter 94-134 prevent problems of double jeopardy. See Dixon, ___ U.S. ___, 113 S.Ct. 2849, 125 L.Ed.2d 556; Fierro v. State, 653 So.2d 447 (Fla. 1st DCA 1995); State v. Miranda, 644 So.2d 342 (Fla. 2d DCA 1994); Richardson v. Lewis, 639 So.2d 1098 (Fla. 2d DCA 1994); Hernandez, 624 So.2d 782. The 1994 amendments established first-degree misdemeanors to punish a broad spectrum of acts that violate the statutory injunction.[11] There is a legitimate concern that a circuit court judge who exercises indirect criminal contempt authority could bar a county court judge from subsequently punishing the misdemeanor. The legislature has decided that a person whose conduct is a serious violation of a domestic violence injunction should have a criminal record. Such a conviction would clearly establish a "prior record" on any subsequent guidelines scoresheet. These decisions fall within the legislative domain. If its penalty structure is not perfect or should include more crimes, we should trust the legislature to change it.
Third, the judicial concept of indirect criminal contempt overlaps with legislative and executive functions. Indirect criminal contempt allows a judge considerable flexibility in deciding the elements of an offense against a victim for acts occurring outside the presence of the judge. The judge also determines who should be prosecuted, and then tries, convicts, and punishes. I do not suggest that this combination of legislative, executive, and judicial functions is prohibited by article II, section 3, of the Florida Constitution. See Johnson, 345 So.2d 1069. Nevertheless, if separation of powers is intended to discourage a concentration of power in one branch, this political doctrine should discourage the avoidable use of indirect criminal contempt when the legislature provides alternative criminal and civil remedies. See Edward M. Dangel, Contempt, § 42A (1939).

III. IN A SEPARATION OF POWERS ANALYSIS, "INHERENT POWERS" MUST BE LIMITED TO ESSENTIAL POWERS
Article V of the Florida Constitution expressly creates many judicial functions the *326 legislature cannot limit or regulate. For example, the legislature cannot assume the power given to the supreme court in article V, section 2, to adopt rules of practice and procedure. See Haven Fed. Sav. & Loan Ass'n v. Kirian, 579 So.2d 730 (Fla. 1991). Likewise, the power to discipline lawyers that was deemed an inherent contempt power in State ex rel. Oregon State Bar v. Lenske, 407 P.2d 250, is an express power in article V, section 15, of the Florida Constitution.
No constitutional provision expressly gives circuit courts the power of indirect criminal contempt. As a result, we are forced in this case to delve into the judiciary's "inherent powers." With a smile, one might suggest that these are the powers that we judges would have included in the constitution if it had been our job to write it. Because it was not our job, we should tread even more cautiously when invoking the separation of powers doctrine to exclude an inherent power from legislative regulation in an overlapping domain.
The phrase "inherent power" or "inherent judicial power" seems to have at least two distinct definitions for use in two different applications. There are times when courts need to exercise power but can find no express authority in the statutes or constitution. In these circumstances, courts invoke an inherent power "reasonably necessary for the administration of justice." See, e.g., State ex rel. Gentry v. Becker, 351 Mo. 769, 174 S.W.2d 181, 183 (1943). The supreme court drew upon this definition of "inherent power" to establish the integrated bar. Petition of Florida State Bar Ass'n, 40 So.2d 902 (Fla. 1949); see also State, Dep't of Health & Rehab. Servs. v. Hollis, 439 So.2d 947 (Fla. 1st DCA 1983). I fully agree that courts have certain inherent powers that arise from their very existence as constitutional institutions.
The fact that courts have "reasonably necessary" powers implied in the constitution does not automatically forbid the legislature from regulating or limiting those implicit powers. See e.g., State ex rel. Robeson v. Oregon State Bar, 291 Or. 505, 632 P.2d 1255 (1981). A Florida court has the "reasonably necessary" inherent power to sanction for disobedience of its orders, but "it is beyond question that the legislature has the power to determine how and to what extent the courts may punish criminal conduct, including contempt." A.A. v. Rolle, 604 So.2d at 815.
Thus, the issue in this case is not resolved by the "reasonably necessary" definition of "inherent power." Instead, it involves a more restrictive definition. There are cases that define "inherent powers" to include powers that are "essential" to the court's existence or to the due administration of justice. In re Robinson, 117 N.C. 533, 23 S.E. 453 (1895); Ex parte Wetzel, 243 Ala. 130, 8 So.2d 824 (1942); 21 C.J.S. Courts § 31 (1990). This is the scope of the judiciary's "inherent powers" that should be employed when evaluating the checks and balances between the legislature and the courts. The judiciary should rarely, if ever, find a need to shield its inherent powers from duly enacted legislation unless the legislation threatens to undermine the existence of the court or its due administration of justice. I am not convinced that the majority opinion has employed this narrower definition of inherent powers.

IV. ALTHOUGH INDIRECT CRIMINAL CONTEMPT IS A REASONABLY NECESSARY POWER OF THE COURTS, IT IS NOT AN ESSENTIAL POWER IN THIS CONTEXT
The majority opinion admits that the legislature can define a penalty for contempt, but apparently rules that the legislature cannot eliminate the court's ability to impose any type of contempt under any circumstance. I am inclined to agree that the legislature cannot eliminate the court's power to find a direct contempt. I am not convinced that the legislature is powerless to limit findings of indirect contempt, at least in the context of domestic violence injunctions. Indirect criminal contempt is not an essential judicial power in this context for at least three reasons.
First, indirect criminal contempt is sufficiently similar to typical criminal law that the legislature should have the constitutional power to substitute criminal offenses for indirect criminal contempt to address specific *327 problems. Conduct outside the courtroom is typically regulated by criminal statutes enacted by the legislature. Only rarely is such conduct a challenge to the authority and dignity of the court. As a result, it is easier for a permissible constitutional overlap of the two branches to occur in the context of an indirect contempt than with direct contempt. In North Carolina, for example, an enactment in 1871 that eliminated certain judicial power over contempt was approved in cases of indirect or constructive contempt, but not approved in cases of direct contempt. See In re Robinson, 23 S.E. 453; Ex parte Schenck, 65 N.C. 353 (1871) (quoted in Ex parte McCown, 139 N.C. 95, 51 S.E. 957 (1905)).
Second, a violation of this statutory injunction is more in the nature of traditional indirect civil contempt than indirect criminal contempt. "Indirect" contempt is "an act done, not in the presence of a court or of a judge acting judicially, but at a distance under circumstances that reasonably tend to degrade the court or the judge as a judicial officer, or to obstruct, interrupt, prevent, or embarrass the administration of justice by the court or judge." Ex parte Earman, 95 So. at 760. "Civil" contempt "consists in failing to do something ordered to be done by a court or judge in a civil case for the benefit of the opposing party therein." Id. This is in contrast to "criminal" contempt, which is "conduct that is directed against the authority and dignity of a court or of a judge acting judicially, as in unlawfully assailing or discrediting the authority or dignity of the court or judge or in doing a duly forbidden act." Id.
There is no question that these statutory injunctions normally result in "indirect" violations. While it can be argued that an act of domestic violence is directed against the authority and dignity of the court, such act is normally directed against the opposing party for whose benefit the injunction has been entered by a judge in a civil proceeding. The judge receives, at most, a glancing blow in these domestic battles. The legislature should be authorized to treat such violations as matters of civil contempt because these violations best fit within that legal category.
Third, the legislature has not eliminated all penalties for violations of these statutory orders. Concerning criminal penalties, the legislature has merely determined that these cases should be filed and litigated in a county criminal court and not in a circuit civil court. Indeed, it may be possible for the circuit judge simply to act as a county judge. See, e.g., Bollinger v. Honorable Geoffrey D. Cohen, 656 So.2d 205 (Fla. 4th DCA), review dismissed, 660 So.2d 712 (Fla. 1995). The court's existence and its due administration of justice are not threatened by a statute that simply moves the proceeding to a different room in the courthouse.
Moreover, the statute does not prevent the use of indirect criminal contempt for orders entered in addition to or subsequent to the statutory injunction. It does not deprive the court of direct criminal contempt for misconduct in the presence of the judge. It applies to only one specific order that is designed to accomplish a particular legislative goal.
The legislature did not deprive the courts of civil contempt remedies. The power to impose compensatory fines should not be underestimated. Equally important, civil coercive fines, assessed for every day of noncompliance, are still available to compel actions required by the statutory injunction. See Habie v. Habie, 654 So.2d 1293 (Fla. 4th DCA 1995).[12] Admittedly, it is more difficult to use jail as a sanction in civil contempt, particularly for some aspects of these injunctions, but the sanction can still be used in appropriate cases.[13] It is difficult for me to accept that when the legislature created new criminal offenses in county court and preserved a significant civil penalty for use by the circuit court, it deprived the courts of a constitutionally essential power.
*328 I recognize that the supreme court in Ducksworth described punishment for contempt as an inherent judicial power. It did so in a case of civil contempt. If the legislature can constitutionally eliminate incarceration for juveniles who commit direct contempt of court, I find it hard to explain how the legislature violates separation of powers by proscribing incarceration for adults who commit indirect contempt in this context. See A.A. v. Rolle, 604 So.2d 813.

V. THE CONFUSION CREATED BY NONREFUNDABLE CIVIL FINES
At the same time that the legislature restricted the circuit court's contempt penalties, it created nonrefundable civil monetary assessments. The relevant portion of chapter 94-134, Laws of Florida, states:
(8)(9)(a) The court shall enforce, through a civil or indirect criminal contempt proceeding, a violation of an injunction for protection which is not a criminal violation under s. 741.31. The court may enforce the respondent's compliance with the injunction by imposing a monetary assessment. The clerk of the court shall collect and receive such assessments. On a monthly basis, the clerk shall transfer the moneys collected pursuant to this paragraph to the State Treasury for deposit in the Displaced Homemaker Trust Fund established in s. 410.30 proceedings compliance by the respondent with the injunction, which enforcement may include the imposition of a fine. Any such fine shall be collected and disbursed to the trust fund establish in s. 741.01.
The legislature passed this provision based on Johnson v. Bednar, 573 So.2d 822 (Fla. 1991), which expressly permits such coercive assessments in civil contempt. If Bednar is correct, then Judge Fulmer's legitimate concerns for the effective enforcement of these injunctions should not be a major factor in this discussion.
The United States Supreme Court's decision in Bagwell may have implicitly overruled the portion of Bednar that authorizes these nonrefundable monetary assessments. See Marc Rohr, Revisiting Florida's Law of Civil Contempt, Fla.B.J., May 1995, at 22. This court must follow Bednar until the Florida Supreme Court determines its viability after Bagwell. If the supreme court recedes from Bednar, then at least a portion of the above-quoted 1994 amendment would probably be unconstitutional because it includes a nonrefundable civil fine. If it declares the entire subsection of the statute unconstitutional for this reason, then presumably the law would return to the pre-amendment condition and circuit courts would have indirect criminal contempt power. See Henderson v. Antonacci, 62 So.2d 5 (Fla. 1952). Thus, despite the extensive discussion of separation of powers both in the majority opinion and in this dissent, the supreme court may have the option to avoid the separation of powers issue and reinstate indirect criminal contempt for a much simpler reason.
NOTES
[1] Because the basis of the motion for contempt in this case was an incident occurring after July 1, 1994, the revised statutory scheme applies to the proceeding pending before the respondent.
[2] Such legislative action seems curiously ironic in light of the expressed intent to treat domestic violence as an affront to public law. Traditionally, one of the well-recognized purposes of criminal contempt proceedings is "to punish conduct offensive to the public in violation of a court order." Adirim v. City of Miami, 348 So.2d 1226, 1227 (Fla. 3d DCA 1977) (emphasis added).
[3] See, e.g., Giles v. Renew, 639 So.2d 701 (Fla. 2d DCA 1994) (failure to comply with rule 3.840 fundamental error).
[4] It is obvious from the facts of Clark that the petitioner Franks was adjudged in indirect criminal contempt for jury tampering and sentenced to a term of incarceration without a purge provision.
[5] Edwards was found in contempt for violating a temporary restraining order and incarcerated, subject to a purge provision. He sought a writ of habeas corpus, contending that his length of imprisonment had exceeded the thirty day incarcerative sanction then prescribed by the legislature for contempt.
[6] As previously noted, Rolle receded from R.M.P. v. Jones, 419 So.2d 618, but only "to the extent that it may suggest conflict with the established principle that the legislature is responsible for determining the punishment for crimes." 604 So.2d at 815, n. 7.
[7] U.S. Const. art I, § 8, cl. 9; art. III, § 1.
[8] Section 741.31(4)(e), Florida Statutes (1995), now provides that a person who violates a domestic violence injunction by "[t]elephoning, contacting, or otherwise communicating with the petitioner directly or indirectly, unless the injunction specifically allows indirect contact through a third party" is guilty of a misdemeanor of the first degree.
[9] I concur in the certified questions. Although this statute had a short duration, the majority's opinion will allow citizens throughout Florida to be prosecuted for indirect criminal contempt despite a statute expressly forbidding such prosecutions. As explained in the last section of this dissent, the supreme court also needs to clarify whether Florida courts are permitted to impose nonrefundable monetary assessments in civil contempt proceedings.
[10] See also 16 Am.Jur.2d Constitutional Law § 296 (1979); John E. Nowak, et al., Constitutional Law 135-37 (2d ed. 1983).
[11] 741.31 Violation of an injunction for protection against domestic violence.  A person who willfully violates an injunction for protection against domestic violence, issued pursuant to s. 741.30, by:

(1) Refusing to vacate the dwelling that the parties share;
(2) Returning to the dwelling or the property that the parties share;
(3) Committing an act of domestic violence against the petitioner; or
(4) Committing any other violation of the injunction through an intentional unlawful threat, word, or act to do violence to the petitioner, coupled with an apparent ability to do so, and through doing some act that creates a well-founded fear that such violence is imminent is guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.
[12] For example, a spouse who refused to participate in treatment could be fined $100 every day until he or she actually participated.
[13] A trial judge may be able to jail a spouse who refused to participate in treatment until the spouse was willing to comply. Likewise, a spouse with ability to pay temporary support, who refused to pay, could be jailed until he or she complied with the support provision of the injunction.